# LINDA JOYCE UNKELBACH *v.* JOHN THOMAS MCNARY
## (SC 15740)

Callahan, C. J., and Norcott, Katz, McDonald and Peters, Js.

Argued January 14—officially released March 31, 1998

*Gerald A. Roisman*, with whom, on the brief, was *Edith F. McClure*, for the appellant (defendant).

*John Q. Gale*, for the appellee (plaintiff).

*Opinion*

KATZ, J. The issues to be decided in this appeal are whether: (1) in modifying the defendant's child support obligation, the trial court properly considered contributions made by the defendant's domestic partner toward

their shared living expenses as an element of the defendant's gross income under the Child Support and Arrearage Guidelines (guidelines);[1] (2) the trial court abused its discretion in ordering the defendant to pay $1000 per month in arrearage payments, in addition to his child support obligation of $252 per week; (3) the trial court abused its discretion by not considering the plaintiff's earning capacity in determining the parties' respective child support obligations; and (4) the trial court abused its discretion in awarding attorney's fees to the plaintiff for expenses incurred in the underlying action and on appeal. The defendant, John Thomas McNary, appeals from the postjudgment orders of the trial court modifying his child support obligation and awarding attorney's fees to the plaintiff, Linda Joyce Unkelbach, in connection with the postjudgment proceedings. After receiving notice of the defendant's appeal, the plaintiff filed a second motion for allowance of attorney's fees seeking an allowance with which to defend the appeal. The trial court, after a hearing, granted the motion and the defendant amended his appeal to include an appeal of that order. We transferred the appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

The facts that are relevant to this appeal are not disputed. The parties' marriage was dissolved on February 1, 1988. The separation agreement ordered into effect by the court on that date awarded primary physical custody of the parties' two minor children to the plaintiff, and ordered the defendant to pay child support

---

[1] The guidelines are set forth at § 46b-215a-1 et seq. of the Regulations of Connecticut State Agencies. The guidelines are promulgated by the commission for child support guidelines, which was established by the legislature pursuant to General Statutes § 46b-215a. General Statutes § 46b-215b (a) provides that the guidelines are to be considered in all determinations of child support in the state, and creates a rebuttable presumption that the amount of support calculated through application of the guidelines is the amount of support to be ordered by the court.

in the amount of $375 per week. At the time of dissolution, the defendant earned a gross weekly wage of $1778.85, and the plaintiff earned a gross weekly wage of $74.40.

As of January 1, 1995, the defendant unilaterally ceased making his court ordered child support payments and, instead, began to make payments that were smaller in amount and sporadic in occurrence. On February 23, 1995, the plaintiff filed a motion for contempt based upon the defendant's failure to pay the child support as ordered. Shortly thereafter, on March 1, 1995, the defendant filed a motion for modification of his child support obligation. The court issued an interim order reducing the defendant's child support to $108 per week, and the parties, with the approval of the court, agreed that any permanent modification of child support would date back to March 1, 1995.

In the fifteen months prior to the time when the defendant ceased making the initial court-ordered child support payments, a number of changes in his circumstances occurred. In October, 1993, his employment was terminated as a result of company downsizing, and he was provided with fifty weeks of severance pay at his full salary rate. He received his last severance check in October, 1994. From approximately October, 1994, through May, 1995, he experienced health problems for which he was twice hospitalized and underwent two surgeries. In July, 1995, the defendant applied for and subsequently received twenty-six weeks of unemployment compensation. Eventually, in April, 1996, he began to receive pension distributions from his former employer in the gross amount of $311 per week.

Following the termination of his employment, the defendant formed a business known as Construction Consultants and Managers, Inc. (Construction Consultants). In 1995, he transferred his interest in the business

to Joan Shoham, his domestic companion, for the purpose of obtaining minority-owned business status in order to enhance the company's ability to obtain contract work. Both the defendant and his companion receive compensation from Construction Consultants, although limited in amount. As of October, 1996, the defendant was receiving $202 per week in gross compensation from Construction Consultants, and Shoham had received a total of $7200 for the year to that date. The trial court found that there was insufficient evidence to determine accurately how much compensation, if any, would redound to the defendant from Construction Consultants in the future, but noted that the success of the business had thus far been limited.

The defendant and Shoham, who have lived together in the defendant's home for approximately the past eight years, commingle their personal incomes to a certain extent and use a joint bank account to pay for household expenses. The trial court found that since October, 1995, Shoham's personal funds have been the source of all monthly mortgage payments on the defendant's home, all monthly payments on the defendant's home equity loan, all monthly loan payments on the defendant's automobile, and all periodic payments for home electricity, cable service, natural gas service, telephone service, property taxes on the residence, groundskeeping, and groceries. Shoham testified that she makes these payments as gifts to the defendant and does not expect to be reimbursed by him.

Since the dissolution of the parties' marriage, the plaintiff has been employed on a full-time basis. From November, 1994, until November, 1995, she was employed as a branch director and supervisor for a home nursing care provider, at a salary of approximately $60,000 per year. The plaintiff voluntarily left that employment because it involved long hours that she felt interfered with her responsibilities as the primary

caretaker of the parties' minor children. Thereafter, she obtained employment requiring her to work only between the hours of 8:30 a.m. and 4 p.m. at a salary of approximately $41,000 per year, or a gross income of $800 per week.

In considering the defendant's motion for modification of his child support obligation, the trial court concluded that a substantial change in circumstances had occurred affecting the ability of each of the parties to provide support for their minor children. The court concluded that the defendant had established his inability to comply with the original child support order due to changes in his health and employment. Although the court found that the defendant's capacity to earn income in the future had not diminished, it did not, as a result, deviate from the guidelines in setting the amount of his child support obligation. Instead, in accordance with its finding of a substantial change in circumstances, the court modified the defendant's child support obligation from $375 per week to $252 per week. The court also ordered the defendant to pay $1000 per month in child support arrearage payments, and awarded the plaintiff attorney's fees in the amount of $1000. Subsequently, the court awarded an additional $3250 in attorney's fees to the plaintiff for the purpose of defending the appeal.

In deciding upon the modified amount of child support to be ordered, the court considered the defendant's present ability to pay. In that regard, it found that the defendant's gross income included amounts contributed by Shoham toward their household expenses. Recognizing that Shoham shared in the value of most of her contributions toward the household expenses, the court found the value of Shoham's contributions to the defendant to be $514 per week, or one half of their actual value, with the exception of the amount paid

toward the defendant's automobile loan, which the court included in full in its calculations.[2]

# I

The defendant first claims that the trial court incorrectly interpreted the definition of gross income set forth in the guidelines when it included in his gross income contributions made by Shoham toward their shared living expenses. According to the defendant, the definition of gross income should not be read to include such contributions because the guidelines preclude consideration of the income of a subsequent spouse or domestic partner in calculating child support, and the inclusion of the contributions leads, in effect, to consideration of Shoham's income. The plaintiff argues, conversely, that including the contributions in the defendant's gross income is not the same as including Shoham's actual income, but only amounts to consideration of specific gifts regularly made by her and, therefore, does not contravene the guidelines. In that regard, the plaintiff contends that inclusion of the contributions in income is in accord with the existing law of this state, which recognizes that gifts received on a regular and consistent basis, regardless of their source, are

---

[2] The trial court found that Shoham made the following weekly contributions to the living expenses incurred by her and the defendant:

| Payment | Amount ($ per week) |
| --- | --- |
| Home mortgage | 153 |
| Home equity loan | 167 |
| Electric service | 87 |
| Cable television service | 14 |
| Natural gas service | 45 |
| Telephone service | 37 |
| Property taxes | 87 |
| Groundskeeping | 35 |
| Groceries | 106 |
| Automobile loan | 148 |

The court included one half of the value of all of these amounts with the exception of the automobile loan, which amount it included in full. The sum of all these payments was determined to be $514 per week.

includible in income in the context of dissolution proceedings where financial orders are being determined. We agree with the plaintiff.

Resolution of this issue requires us to interpret the statutory scheme that governs child support determinations in Connecticut, and, therefore, constitutes a question of law. *Charles* v. *Charles*, 243 Conn. 255, 258, 701 A.2d 650 (1997). "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *Keeney* v. *Old Saybrook*, 237 Conn. 135, 143, 676 A.2d 795 (1996). When the question of law involves statutory interpretation, that determination is guided by well settled principles. We have previously stated that in construing statutes, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . ." (Citations omitted; internal quotation marks omitted.) *Conway* v. *Wilton*, 238 Conn. 653, 663–64, 680 A.2d 242 (1996).

We begin with a brief overview of the guidelines. The guidelines are predicated upon the concept that children should receive the same proportion of parental income that they would have received had the family remained intact. Child Support and Arrearage Guidelines, Preamble, § (c), pp. ii-iii. Toward that end, the guidelines are income driven, rather than expense driven. At each income level, the guidelines allocate a certain percentage of parental income to child support. The percentage allocations contained in the guidelines

aim to reflect the average proportions of income spent on children in households of various income and family sizes, and contain a built-in self-support reserve for the obligor. Id., §§ (c) and (d), pp. ii-iii. The result is that the guidelines incorporate an allocation of resources between parents and children that the legislature has decided is the appropriate allocation. Consequently, our interpretation of the guidelines must seek to preserve this allocation.

The definition of gross income set forth in the guidelines does not address explicitly contributions or gifts given by a subsequent spouse, domestic partner, or any other third party, to a parent whose child support obligation is being determined. Section 46b-215a-1 (11) of the Regulations of Connecticut State Agencies defines gross income as "the average weekly income before deductions."[3] That section further identifies

[3] Section 46b-215a-1 of the Regulations of Connecticut State Agencies provides in relevant part: "(11) 'Gross income' means the average weekly income before deductions.

"(A) Inclusions

"Gross income includes, but is not limited to:

"(i) salary and wages, including overtime

"(ii) commissions, bonuses, tips and perquisites

"(iii) rental income after deduction of reasonable and necessary expenses

"(iv) estate or trust income

"(v) royalties

"(vi) interest, dividends, and annuities

"(vii) social security (excluding Supplemental Security Income [SSI]), veterans, unemployment and workers' compensation, retirement, pension, and other benefits

"(viii) net proceeds from contractual agreements

"(ix) self-employment earnings, after deduction of all legitimate business expenses

"(x) alimony being paid by an individual who is not a party to the support determination

"(xi) unearned income from all sources

"(xii) in-kind compensation (any basic maintenance or special need such as food, shelter, or transportation provided on a recurrent basis in lieu of salary).

"(B) Exclusions

"Gross income does not include:

twelve specific elements of gross income and provides that "[g]ross income includes, but is not limited to" those items. Regs., Conn. State Agencies § 46b-215a-1 (11) (A). In addition, that regulation expressly excludes two items from the definition of gross income, namely, child support received on behalf of a child living with the parent for whom the support obligation is being determined, and federal, state and local public assistance grants. Regs., Conn. State Agencies § 46b-215a-1 (11) (B). Although this definition does not specifically identify contributions or gifts received from a subsequent spouse, domestic partner, or other third party as an item expressly included in gross income, the definition does provide that the items expressly enumerated do not comprise an exhaustive list. Regs., Conn. State Agencies § 46b-215a-1 (11) (A). Gifts are also not mentioned in the list of items that are expressly excluded from gross income under subsection (11) (B) of the regulation. Therefore, while the issue of whether gifts are includible in income is not resolved by reference to the definition of gross income alone, it is clear that, by its plain language, the definition does not preclude their inclusion.

The guidelines are preceded by a preamble that "is intended to assist users of the child support and arrearage guidelines but is not part of the official regulations." Child Support and Arrearage Guidelines, Preamble, § (a), p. i. The preamble explains the concept of gross income contained in the guidelines, but, like the definition, does not address contributions or gifts made by third parties to parents. The preamble addresses the actual *income* of a subsequent spouse or domestic partner, and makes clear that such income is not included in the definition of gross income. Child Support and

---

"(i) support received on behalf of a child who is living in the home of the parent whose income is being determined

"(ii) federal, state, and local public assistance grants. . . ."

Arrearage Guidelines, Preamble, § (f) (1) (F), p. ix. It does not, however, indicate expressly that contributions or gifts from a subsequent spouse, domestic partner, or other third party, are intended to be excluded from gross income under the guidelines.

We have previously interpreted broadly the definition of gross income contained in the guidelines to include items that, in effect, increase the amount of a parent's income that is available for child support purposes. In *Jenkins* v. *Jenkins*, 243 Conn. 584, 704 A.2d 231 (1998), we held that social security dependency benefits received directly by the children of a noncustodial parent on account of that parent's disability must be included in the noncustodial parent's income for purposes of determining the parent's child support obligation. We reasoned that, because the guidelines provide for a credit against the child support obligation in the amount of the benefits paid directly to the children, the noncustodial parent benefits by having an obligation discharged, thereby enabling him to retain more income for himself. We also reasoned in part that the failure to include the social security dependency benefits in the noncustodial parent's gross income would lead to a result that is inconsistent with the public policy underlying the guidelines—namely, the policy, when determining child support obligations, of accounting for all income that would have been available to support the children had the family remained intact. Therefore, we required that the benefits be included in gross income under the guidelines.

Similarly, in other proceedings emanating from the dissolution of a marriage, our approach has been to interpret the concept of income broadly so as to include in income items that increase the amount of resources available for support purposes. In cases concerning alimony, we have indicated that regularly and consistently received gifts, whether in the form of contributions

to expenses or otherwise, are properly considered in determining alimony awards to the extent that they increase the amount of income available for support purposes.[4]

In *Rubin* v. *Rubin*, 204 Conn. 224, 225, 527 A.2d 1184 (1987), for example, a husband appealed from an order granting his former wife a contingent assignment of property related to certain assets that he was expected to acquire under his mother's will and revocable trust.[5] This court determined that the order could not be sustained either as an assignment of property or as an award of alimony. Id., 227–28. In so concluding, this court did not decide that evidence relating to the husband's mother's wealth was inadmissible in regard to the alimony determination. Distinguishing between a contingency, such as the possibility of a future inheritance, and evidence of substantial gratuities received in the past, this court indicated that evidence of the latter is admissible in formulating financial orders relating to dissolution of marriage. Id., 238–39. "[W]here the past gratuities have been made on a regular basis . . . the court may reasonably assume that those contributions will continue. If they should terminate, any . . . award may be modified." Id.; see also *Anderson* v. *Anderson*, 191 Conn. 46, 55–57, 463 A.2d 578 (1983) (trial court properly considered fact that one party regularly and consistently received substantial gratuities

---

[4] The statutory provisions governing awards of alimony and child support employ many of the same criteria. See General Statutes §§ 46b-82 through 46b-86. As a result, this court has previously held that alimony and child support are issues that are "entirely interwoven" and require similar treatment. *Fahy* v. *Fahy*, 227 Conn. 505, 515, 630 A.2d 1328 (1993). It is, therefore, appropriate to consider alimony cases in examining the issue in this case.

[5] Although *Rubin* was decided prior to the enactment of the guidelines, the guidelines do not supersede General Statutes § 46b-84, but, rather, are intended to supplement the criteria set forth in that section. General Statutes § 46b-215b (b). Thus, the decision in *Rubin* remains relevant to the issue in this case where the guidelines do not expressly dictate the treatment of gratuities that have been made on a regular and consistent basis.

from relatives in past when it formulated financial orders relating to dissolution of marriage); *McGuinness* v. *McGuinness*, 185 Conn. 7, 12–13, 440 A.2d 804 (1981) (insofar as plaintiff's second wife's income was relevant to plaintiff's current expenses and ability to pay alimony it was properly considered).

To the extent that they are indicative of the approach we have adopted in the past—interpreting gross income broadly so as to include items that increase the amount of income available for support purposes—our prior cases addressing child support and alimony are significant, because the same effect that compelled those decisions is present in this case. Here, the regular contributions made by Shoham increase the amount of the defendant's income that is available for support purposes.

The defendant relies primarily upon the public policy embodied in the preamble to the guidelines for his argument that the contributions should not be included in gross income. The preamble provides that the commission for child support guidelines (commission), which promulgated the guidelines, decided not to include the income of a subsequent spouse or domestic partner in the definition of gross income contained in the guidelines because the inclusion of such income "inevitably leads to extremely complex calculations, especially if the spouse or partner has his or her own child support obligations," and because "there is under Connecticut law no legal basis for imputing support liabilities to such a [third party]." Child Support and Arrearage Guidelines, Preamble, § (f) (1) (F), p. ix. The defendant argues that this policy is contravened when contributions toward a parent's living expenses made by a parent's domestic partner are included in the parent's income because the domestic partner in effect becomes a source of support for the children of the parent's prior marriage. We disagree.

The inclusion of regularly received gifts in a parent's income differs significantly from the inclusion of the income of a subsequent spouse or domestic partner. First, including the value of gifts received from a subsequent spouse or domestic partner does not have the effect of imputing liability to that individual. A domestic partner whose own actual income is at issue has only two options if he or she seeks to have that income excluded from the parent's gross income. He or she must choose between terminating the income generating activity or altering the relationship with the parent in order to prevent the inclusion of his or her income in the parent's gross income. In this situation, however, no such problem is presented. A donor is entitled to cease making gifts at any time and, at such time as that occurs, the parent may seek a modification of the child support obligation based upon the resulting reduction in income, without penalty to either the parent or the donor. Therefore, no liability may be imputed to a third party donor based upon the inclusion of the gifts made by the donor in the recipient's gross income.

Second, the inclusion of regularly and consistently received gifts does not lead to the extremely complex calculations that the commission sought to avoid when it decided against including a subsequent spouse's or domestic partner's income in the definition of gross income. As this court stated in *Rubin*, "evidence of past gratuities does not inevitably entail the necessity of probing into the personal financial affairs of persons who have no other involvement in the marital dispute before the court than their relationship to one of the parties." *Rubin* v. *Rubin*, supra, 204 Conn. 239.

Third, the inclusion of contributions and other gifts in gross income is not likely to result in a diversion of the donor's resources from the donor's own obligations or dependents. We logically may presume, based upon the fact that the donor has *chosen* to make the gifts,

that the donor is financially able to do so. Conversely, if the resources used to make the gifts were needed to provide for the third party's own needs or the needs of the third party's dependents, we may presume that the gifts would not have been made.

Finally, the fact that the commission decided to make clear in the preamble that gross income does not include the income of a subsequent spouse or domestic partner, but did not discuss any other exemptions from gross income, indicates that regularly and consistently received gifts were not intended to be excluded from gross income. The guidelines, both in the preamble and in the definition section, § 46b-215a-1 of the Regulations of Connecticut State Agencies, contain express exclusions from an otherwise broad definition of gross income. Therefore, there is no basis for reading the exclusion contained in the preamble broadly. In fact, to do so would be inconsistent with our established policy of reading broadly the definition of gross income. If the commission had intended to exclude gifts from gross income, it could have done so expressly. The fact that it did not supports our interpretation.

The legislative policy underlying the guidelines further supports an interpretation of gross income that includes gifts that are regularly and consistently received. As we have already noted, the guidelines are predicated upon the concept that children should receive the same proportion of parental income that they would have received had the family remained intact. Child Support and Arrearage Guidelines, Preamble, § (c), pp. ii–iii. At each income level, they allocate a certain percentage of parental income to child support. The allocations are intended to reflect the average proportion of income that, theoretically, would be spent on children in intact families, and contain built-in self-support reserves for obligors. Id., §§ (c) and (d), pp. ii–iii. In situations like the present one, the failure to

include the contributions of the parent's domestic partner leads to an allocation between parent and child that is proportionately at odds with the allocation contemplated by the guidelines. Here, the defendant, rather than being required to spend a certain proportion of his weekly income on his own support needs, instead has nearly all of his income available for other purposes. The guidelines, however, being income driven, do not contain an expense category wherein the benefit received by the defendant may be reflected.[6] As a result, the only way in which to reflect the economic reality of the defendant's situation, and thereby arrive at an allocation of resources between parent and child that is consistent with the guidelines, is to include the contributions in income for child support determination purposes.

For all of the above reasons, we conclude that the trial court properly included in the defendant's gross income the contributions made by his domestic partner toward his living expenses when it determined his child support obligation under the guidelines.

## II

The defendant's remaining claims all allege an abuse of discretion by the trial court. Specifically, the defendant contends that the trial court abused its discretion when it: (1) ordered him to pay $1000 per month in arrearage despite his limited income; (2) found the plaintiff to be employed at full capacity although she had earned considerably more income in an earlier year; and (3) awarded attorney's fees to the plaintiff without first finding either that she was unable to pay her own

---

[6] Under the guidelines, "net income" equals gross income less only certain, specified deductions that do not include household or living expenses. A specified percentage of the resulting net income is then calculated and presumed to be the correct amount of the support obligation. Household and living expenses do not factor at all into the calculation of child support under the guidelines. Regs., Conn. State Agencies § 46b-215a-2 (b).

attorney's fees or that requiring the plaintiff to pay her own fees would undermine the effect of the court's other financial orders.

"As has been repeatedly stated by this court, judicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did." (Internal quotation marks omitted.) *Holley* v. *Holley*, 194 Conn. 25, 29, 478 A.2d 1000 (1984). "Our function in reviewing such discretionary decisions is to determine whether the decision of the trial court was 'clearly erroneous in view of the evidence and pleadings in the whole record.' Practice Book § 4061 [now Practice Book (1998 Rev.) § 60-5]." *Turner* v. *Turner*, 219 Conn. 703, 709, 595 A.2d 297 (1991). "With respect to the financial awards in a dissolution action, great weight is given to the judgment of the trial court because of its opportunity to observe the parties and the evidence. Moreover, the power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage." (Internal quotation marks omitted.) *Holley* v. *Holley*, supra, 29. For that reason, "we allow every reasonable presumption in favor of the correctness of [the trial court's] action." (Internal quotation marks omitted.) *Charpentier* v. *Charpentier*, 206 Conn. 150, 154–55, 536 A.2d 948 (1988).

## A

We first address the defendant's claim that the trial court abused its discretion in ordering him to pay $1000 per month in arrearage. The defendant argues that the $1000 per month amount contravenes the guidelines, which prescribe that, as a general rule, arrearage payments are to be set at 20 percent of the current weekly

support amount. Because the payment equals approximately 92 percent of the defendant's weekly support obligation, and the trial court did not find that any of the deviation criteria applied to justify the departure from the general rule, the defendant argues that the trial court abused its discretion in ordering the payment. We agree.

Arrearage payments are addressed at length and in extensive detail in the guidelines, and as a result the trial court's discretion in setting arrearage payments is closely circumscribed by the breadth of the law that it must apply. In this case, our conclusion that the trial court abused its discretion is based upon the fact that it did not substantiate its decision by making the explicit findings in the record that are expressly required by the guidelines. Its failure to do so constitutes an incorrect application of the law, and, therefore, an abuse of discretion.

Sections 46b-215a-4 and 46b-215a-5 of the Regulations of Connecticut State Agencies address arrearage payments. Section 46b-215a-4 (b) provides that, as a general rule, "the weekly order of payment toward any arrearage shall be twenty percent (20%) of the weekly current support order, rounded to the nearest dollar, provided . . . (1) the sum of the weekly payments on current support and arrearages shall not exceed fifty-five percent (55%) of the obligor's net weekly income . . . ." Section 46b-215a-5 creates a rebuttable presumption that the amount arrived at through application of the general rule is the amount to be ordered, and also provides for deviation from the general rule. Under that section, the presumption "may be rebutted by a specific finding on the record that the application of such guidelines would be inequitable or inappropriate in a particular case. Any such finding shall state the arrearage payment that would have been required under the guidelines and include a justification for the variance. Only

the deviation criteria described in this section establish sufficient bases for such findings." Regs., Conn. State Agencies § 46b-215a-5 (a).[7]

In *Favrow* v. *Vargas*, 231 Conn. 1, 647 A.2d 731 (1994), this court considered the provisions in the guidelines that allow for deviation with respect to child support obligations. Section 46b-215a-3 (a) of the Regulations of Connecticut State Agencies employs language identical to the language of § 46b-215a-5 (a) in creating a rebuttable presumption that the amount of child support calculated through application of the guidelines is the amount that should be ordered.[8] Both sections require that, in order to rebut the regulatory presumptions, the trial court make a "specific finding on the record that the application of [the] guidelines would be inequitable or inappropriate in a particular case" and "state the amount of support that would have been required under the guidelines and include a justification for the variance." Regs., Conn. State Agencies §§ 46b-215a-3 (a) and 46b-215a-5 (a). Examining that language

[7] Section 46b-215a-5 (b) of the Regulations of Connecticut State Agencies allows deviation in setting the amount of arrearage payments as follows: "Criteria for deviation from arrearage guidelines

"The arrearage order is based on the current support order and will already reflect consideration of the criteria for deviation from the child support guidelines. Therefore, the criteria for deviating from the arrearage guidelines are more limited. They are as follows:

"(1) If the current support order was affected by the application of one or more deviation criteria, the trier of fact may consider adjusting the arrearage payment order upward or downward.

"(2) Other equitable factors."

[8] Section 46b-215a-3 (a) of the Regulations of Connecticut State Agencies provides: "Introduction

"The amount of current support calculated under the child support guidelines is presumed to be the correct amount to be awarded. The presumption may be rebutted by a specific finding on the record that the application of such guidelines would be inequitable or inappropriate in a particular case. Any such finding shall state the amount of support that would have been required under the guidelines and include a justification for the variance. Only the deviation criteria described in this section establish sufficient bases for such findings."

in § 46b-251a-3 (a) in *Favrow*, we held that it requires the trial court "first [to] determine on the record the amount of support indicated by the guidelines schedule" before determining whether to deviate from that amount. *Favrow* v. *Vargas*, supra, 25. We conclude that the identical language in § 46b-215a-5 (a) must be interpreted in the same manner here. As a result, the trial court is required to first determine and state in the record the amount of the arrearage payment determined pursuant to § 46b-215a-4 that, under § 46b-215a-5 (a), is presumed to be the correct amount to be ordered, before determining whether the presumption has been rebutted in accordance with the other provisions of that section.

In this case, the trial court did not make the findings in the record required by § 46b-215a-5 (a). The trial court found that the defendant has a gross income of $1027 per week, comprised of $311 per week in pension distributions, $202 per week in business income from Construction Consultants, and $514 per week in gifts received from Shoham on a regular and consistent basis. After crediting the defendant for taxes and health insurance as allowed by the guidelines, the court found the defendant's income for child support purposes to be $917 per week. It also noted that the defendant is obligated currently to pay child support in the amount of $252 per week.

In accordance with the guidelines, the trial court next should have determined and stated in the record that 20 percent of the current weekly support order of $252 equals approximately $50 per week. Without doing so, however, the trial court ordered arrearage payments of $233 per week, a payment equal to 92 percent of the $252 weekly support obligation. Although the mathematical calculation that 20 percent of $252 is $50.40 is one that under the circumstances of this case this court could perform, the trial court must, in the first instance, make

that determination not simply as a matter of mathematics but as a measure against which to decide whether application of the guidelines would be inequitable or inappropriate. As we stated in *Favrow* v. *Vargas*, supra, 231 Conn. 27, "[t]he notion of a presumptively correct level of support . . . strongly suggests a particular amount of money as a starting point." Requiring the trial court to determine the amount of the arrearage payment to be ordered pursuant to the guidelines before deciding whether and to what extent to deviate from the guidelines is appropriate because it "will facilitate appellate review in those cases in which the trial court finds that a deviation is justified" and will enable an appellate court to "make a more informed decision on a claim that the amount of the deviation, rather than the fact of a deviation, constituted an abuse of discretion." Id., 29.

In this case, the trial court did not calculate the presumptively correct support order pursuant to the guidelines, did not make a specific finding on the record that application of the general rule would be inequitable or inappropriate under these circumstances, and did not include a justification for the variance. The only finding by the court that is at all relevant in this regard is the finding in which the court concluded that "the defendant possesses significant assets, which are available to him for purposes of addressing the child support arrearage." This statement does not satisfy the requirements of § 46b-215a-5 (b) as we interpret it. We conclude, therefore, that the trial court's order of $1000 per month in arrearage constituted an abuse of discretion.

## B

The defendant next claims that the trial court abused its discretion in failing to consider the plaintiff's earning capacity in determining his child support obligation. We disagree.

Under the guidelines, the child support obligation first is determined without reference to earning capacity, and earning capacity becomes relevant only if a deviation from the guidelines is sought under § 46b-215a-3 (b) (1) (B). Pursuant to § 46b-215a-3 (a), the amount of support determined without reference to the deviation criteria is presumed to be the correct amount of support, and that presumption may only be rebutted by a specific finding on the record that the application of the guidelines would be inequitable or inappropriate under the circumstances of a particular case. When the latter is true, § 46b-215a-3 (b) (1) (B) allows deviation from the guidelines on the basis of a parent's earning capacity.

In determining the defendant's child support obligation, the trial court first determined the actual incomes of both the defendant and the plaintiff. The trial court found the defendant's net weekly income for child support purposes to be $917 per week, and the plaintiff's to be $586 per week. The court further noted that while it found "the plaintiff to be employed at full earning capacity," it did not find the defendant to be "working at capacity at this time, [although] his capacity to earn income has not diminished at all." The trial court made these findings despite the fact that both the plaintiff and the defendant had previously earned more income than they were earning at the time of the trial court proceedings. Significantly, although the court made findings as to the earning capacities of both parties, it did not use those findings to deviate from the guidelines in setting the defendant's child support obligation. Therefore, the defendant can prevail on this claim only if he can demonstrate that the trial court *should have deviated* from the guidelines on the basis of the plaintiff's earning capacity, and that the failure to do so constituted an abuse of discretion.

In order to have deviated from the guidelines in setting the defendant's child support obligation, the trial court would have been required, pursuant to § 46b-215a-3 (a), to find that application of the guidelines would have been inequitable or inappropriate under the circumstances, and would have had to make specific findings on the record in that regard. Here, the findings made by the trial court were that the plaintiff, for one year during 1994–95, had earned an annual salary of $60,000 at employment that required her to work approximately sixty to seventy hours per week, some of those hours on weekends. There was also evidence in the record that, at the end of that year, the plaintiff left the employment for alternate full-time employment involving fewer hours and paying only $41,000 per year. The record further contained undisputed evidence suggesting that the plaintiff sought new employment that involved fewer hours because the hours associated with her former employment interfered with her responsibilities as primary caretaker of the parties' minor children. On the basis of this evidence, the trial court reasonably could have concluded that the plaintiff *was* employed at full capacity, and, as a result, no deviation from the guidelines was justified. "Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." *Lucy* v. *Lucy*, 183 Conn. 230, 234, 439 A.2d 302 (1981). Similarly, we recognize a parent's child care responsibilities as a factor that may affect earning capacity. Therefore, under the circumstances of this case, we cannot conclude that the trial court abused its discretion.

C

The defendant's fourth and fifth claims pertain to the court's order that he pay a portion of the plaintiff's

attorney's fees. The defendant contends that the trial court abused its discretion when it awarded the plaintiff $1000 in attorney's fees in relation to the trial court proceedings, and $3250 in attorney's fees for the purpose of defending the appeal, because in so doing the court improperly considered Shoham's contributions in assessing his ability to pay an award, and failed properly to examine and limit its focus to whether he had sufficient liquid funds with which to satisfy the awards. We disagree.

In proceedings concerning the support of a minor child, the court may order either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in General Statutes § 46b-82.[9] General Statutes § 46b-62.[10] "Whether to allow counsel fees, and if so in what amount, calls for the exercise of judicial discretion." (Internal quotation marks omitted.) *Holley* v. *Holley*, supra, 194 Conn. 33–34. "Courts ordinarily award counsel fees in divorce cases so that a party . . . may not be deprived of [his or] her rights because of a lack of funds. . . . Where, because of other orders, both parties are financially able to pay their own counsel fees, they should be permitted to do so." (Internal quotation marks omitted.) *Koizim* v. *Koizim*, 181 Conn. 492,

[9] General Statutes § 46b-82 provides in relevant part: "In determining . . . the duration and amount of the award, the court . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment."

[10] General Statutes § 46b-62 provides in relevant part: "Orders for payment of attorney's fees in certain actions. In any proceeding seeking relief under the provisions of this chapter . . . the court may order . . . if such proceeding concerns the . . . support of a minor child, either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . ."

501, 435 A.2d 1030 (1980). If, however, "the failure [to make an award] would substantially undermine the other financial awards" an award of attorney's fees is justified. *Eslami* v. *Eslami*, 218 Conn. 801, 820, 591 A.2d 411 (1991). "An abuse of discretion in granting counsel fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." *Cook* v. *Bieluch*, 32 Conn. App. 537, 544, 629 A.2d 1175, cert. denied, 228 Conn. 910, 635 A.2d 1229 (1993). In making an award of attorney's fees, "[t]he court is not obligated to make express findings on each of these statutory criteria." *Weiman* v. *Weiman*, 188 Conn. 232, 234, 449 A.2d 151 (1982).

Section 46b-82 requires the court to consider the amount and sources of income of each party in determining whether to award attorney's fees. Here, the trial court found that the contributions to the defendant's living expenses made by his domestic partner constituted income to the defendant. Having so found, the court properly included these contributions in its assessment of the defendant's ability to pay a portion of the plaintiff's attorney's fees.

With regard to the trial court proceeding, the record further discloses that the trial court specifically considered the remaining statutory criteria and the parties' overall financial abilities in determining whether to award attorney's fees. First, the trial court explicitly stated in its memorandum of decision that it had considered the required factors as follows: "Recognizing the respective financial abilities of the parties, the lack of change in the defendant's capacity to earn income, and the criteria set forth in § 46b-82, the court has provided the plaintiff with a reasonable award of attorney's fees pursuant to § 46b-62. . . . In light of the parties' respective financial abilities and the criteria set forth in § 46b-82, the court finds that the plaintiff shall be permitted an allowance of $1000 in this matter."

The record fully supports the trial court's statement—it is replete with evidence of the parties' financial abilities, and with evidence pertaining to the statutory criteria set forth in § 46b-82. In addition to containing the financial affidavits of each party, the record contains other evidence of each party's financial abilities, including evidence as to each party's income, expenses, assets, liabilities, earning capacity, age, health, station, occupation, amount and sources of income, vocational skills and employability, as well as the estate and needs of each of the parties. The court stated that it specifically had considered all of this evidence in awarding attorney's fees to the plaintiff.

Furthermore, the evidence is sufficient to support the award of attorney's fees. The plaintiff's financial affidavit of October 21, 1996, disclosed that she had assets of $83,686, consisting of bank accounts totaling $1686 and equity in her home and automobile, liabilities of $50,800, a net weekly income of $694, and weekly expenses of $952. The defendant's financial affidavit, on the other hand, disclosed that as of October 24, 1996, he had assets valued at $264,256, comprised mainly of equity in his home and automobiles, an independent retirement account, a 401K plan, and a pension already in pay status, liabilities of $32,038, a net weekly income of $376, weekly gift contributions of $514, and weekly expenses of $1700. While neither party possessed a weekly income sufficient to cover weekly expenses, examining the evidence in the record, the court reasonably could have concluded either that the plaintiff lacked sufficient funds with which to pay her own attorney's fees, or that the failure to award her attorney's fees would undermine the intended effects of its other financial orders. Under these circumstances, we do not find a clear abuse of discretion.

With regard to the attorney's fees awarded for purposes of defending the appeal, the defendant contends

that the trial court failed to consider whether he has sufficient liquid assets with which to satisfy the award. The availability of ample liquid funds with which to pay an award, however, is "not an absolute litmus test for an award of counsel fees." *Maguire* v. *Maguire*, 222 Conn. 32, 44, 608 A.2d 79 (1992). "This is because a trial court's discretion should be guided so that its decision regarding attorney's fees does not undermine its purpose in making any other financial award." (Internal quotation marks omitted.) *Anderson* v. *Anderson*, 191 Conn. 46, 59, 463 A.2d 578 (1983).

The trial court held a hearing on July 23, 1997, to consider the plaintiff's motion for attorney's fees related to defending the appeal. At the hearing, the court considered a revised financial affidavit executed by the plaintiff, and, because the defendant averred that his financial situation remained unchanged, it also considered the financial affidavit of the defendant that he had submitted in the earlier proceedings. The plaintiff's updated financial affidavit revealed, however, that her situation had changed. Since October 21, 1994, she had received a modest increase in compensation from employment, and, after receiving the increase in child support to $252 per week, has approximately $140 per week remaining after paying household expenses. Offsetting those improvements, however, was an increase in total liabilities of $20,000, attributable to home repairs, attorney's fees, and other expenses, and the discovery of an error on her previous financial affidavit that failed to reflect the proper amount owed on her home mortgage, so that at the time the plaintiff actually owed $31,000 more on her mortgage than was indicated in the October 21, 1996 financial affidavit. Furthermore, at the hearing, the court had available to it evidence as to all of the other statutory criteria submitted in the earlier proceedings.

Following the presentation of evidence at the hearing, the court awarded $3250 in attorney's fees to the plaintiff. In so doing, the court stated that it relied upon "the financial status [of the parties] as set forth before [it]." The court again concluded, as it had done in the proceedings on the motions for contempt and modification of child support, that the defendant "has greater income available for support of the children than [the plaintiff]" and "has greater income available to him than does [the plaintiff] for purposes of paying counsel fees." Therefore, the court stated that it found it "fair and appropriate" to award counsel fees to the plaintiff.

In light of the evidence presented and these findings and conclusions made by the court, we cannot say that the court abused its discretion in awarding the plaintiff an amount that would pay approximately one half of her anticipated attorney's fees. The court reasonably could have concluded, following the hearing, either that the plaintiff lacked sufficient funds with which to pay her own attorney's fees, or that if the plaintiff were required to pay the entire amount of her anticipated attorney's fees, the purpose of the court's earlier financial orders would be undermined. Although the court did not expressly make such a finding, the record clearly supported one. Furthermore, an express finding is not required. *Weiman* v. *Weiman*, supra, 188 Conn. 234. Instead, as an appellate court, we will examine the record to determine if the trial court incorrectly applied the law or could not reasonably have concluded as it did. *Caffe* v. *Caffe*, 240 Conn. 79, 83, 689 A.2d 468 (1997). In this case, we conclude that the trial court reasonably could have concluded that the award of attorney's fees was warranted on the basis of the statutory criteria set forth in § 46b-62 and our prior interpretations of that section.

The judgment of the trial court is reversed in part and the case is remanded for consideration of whether

a departure from the guidelines with respect to the child support arrearage payment is warranted.

In this opinion the other justices concurred.