******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KIMBERLY HENDRICKS *v.* SANDOR
ANTHONY HAYDU
(AC 36333)

DiPentima, C. J., and Keller and Mullins, Js.

*Argued May 11—officially released September 29, 2015*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, S. Richards, J.)

*Alicia P. Chalumeau*, with whom was *Melissa A.
Brescia*, for the appellant (defendant).

*Jason P. Gladstone*, for the appellee (plaintiff).

*Opinion*

DiPENTIMA, C. J. The defendant, Sandor Anthony Haydu, appeals from the judgment of the trial court granting in part the motion for modification of child support filed by the plaintiff, Kimberly Hendricks. On appeal, the defendant claims that the court improperly (1) excluded the plaintiff's bonus income in calculating her gross income when modifying the child support award; (2) failed to deviate from the child support and arrearage guidelines (guidelines); and (3) ordered the defendant to pay the modified child support amount retroactive to the date of service of the plaintiff's motion. We agree with the defendant's first claim, and, accordingly, we reverse in part the judgment of the court.[1]

The record reveals the following relevant facts and procedural history. The parties, who never married, have four children together.[2] On August 17, 2011, the parties entered into a parenting agreement. On November 29, 2011, the court, *Malone, J.*, rendered judgment ordering the defendant to pay $95 per week in child support. On August 22, 2012, the plaintiff filed a motion for modification seeking, inter alia, an increase in child support due to the defendant's change in employment status. The court, *S. Richards, J.*, heard testimony on April 11, May 7, and June 5, 2013, from both parties, as well as the defendant's witness, James Pierson, vice president for corporate human resources at Hexcel Corporation (Hexcel).

At trial, the defendant introduced four exhibits relevant to the issues on appeal: (1) the plaintiff's employment offer letter from Hexcel; (2) the plaintiff's 2012 earnings summary; (3) the plaintiff's 2013 earnings summary through March 31, 2013; and (4) the plaintiff's participant statement showing whether stock options had vested or would vest in the future.

The offer letter provided that the plaintiff could participate in Hexcel's deferred compensation plan, which consisted of a qualified 401(k) component and a non-qualified component. In this plan, the plaintiff could elect to defer receiving part of her base salary and annual bonus. The offer letter also explained that Hexcel provided the plaintiff with two bonus plans. The management incentive compensation plan (MICP) was a cash bonus plan consisting of a "target cash incentive equal to 40% of [the plaintiff's] annual base salary." The long-term incentive plan (LTIP) was an equity bonus compensation plan consisting of stock options. The compensation range for this plan was between 44 percent to 66 percent of the plaintiff's "then-current base pay . . . ." It paid out the LTIP in two forms of stock options, namely, restricted stock units (RSU) and performance restricted stock units (PRSU). Hexcel granted the RSU on the basis of how long the plaintiff continued

employment with the company. The PRSU was a performance based stock bonus that would only be awarded if the performance criteria were met.

The 2012 earnings summary showed that the plaintiff was compensated with her base salary, that she was awarded her MICP cash bonus, and that she deferred approximately $25,000 into the deferred compensation plan. The 2012 earnings summary revealed that the plaintiff was awarded RSUs but was not awarded PRSUs. The plaintiff's 2013 earnings summary indicated that she received the annual MICP and LTIP bonuses. It also showed that she deferred approximately $100,000 into the deferred compensation plan. Finally, the plaintiff's participant statement indicated the potential income of her stock options. It reflected that thousands of various stock options would vest through 2015.[3]

While explaining the RSU, Pierson testified that the plaintiff's 2012 earnings summary deduction column contained an entry that reflected "taxes that [were] taken from the [RSU] *income* that [was] received." (Emphasis added.) Also, when questioned about the "categories of income that [the plaintiff] receive[d] in addition to the base [salary]," Pierson testified that she received the MICP, LTIP, and deferred compensation. Moreover, in describing the RSU and PRSU, Pierson acknowledged that "[t]hose shares have an *obvious economic value . . . which we calculate and it becomes W-2 income.*" (Emphasis added.) However, regarding the nonqualified component of the deferred compensation plan, Pierson explained that once the plaintiff deferred money from either her base salary or annual bonus into the nonqualified component of the plan, it became "an asset of the company."[4]

Although the plaintiff's bonuses were not guaranteed, she had received her MICP cash bonus every year of her employment and Pierson believed that the MICP and LTIP bonuses were in all "likelihood . . . [to] continue into the future." Indeed, Pierson testified that there was no "way to determine . . . the future of those potential payouts." Reinforcing the fact that the bonuses were not guaranteed, the plaintiff testified that in 2012 Hexcel changed its bonus structure making it "more difficult to receive the higher bonuses."[5]

On November 14, 2013, the court issued its memorandum of decision.[6] The court found that the plaintiff was employed by Hexcel since September, 2009, with a current annual base salary of $274,735. The court also found that "the plaintiff ha[d] the potential to receive . . . two types of bonuses," one type in the form of a cash bonus and the other type in the form of stock options that "vest over several years and are valued as of the date of vesting." As to the defendant, the court found that he was unemployed from September, 2011 to April, 2012, when he was hired as a controller in a

New York City bakery. His annual salary was $85,000.

Pursuant to § 46b-215a-1 et seq. of the Regulations of Connecticut State Agencies, both parties submitted worksheets calculating their respective support obligations. The court rejected the parties' worksheets and prepared its own worksheet "based on the actual income figures of the parties as set forth in their respective financial affidavits . . . ."[7] Without expressly finding the gross income for either party, the court calculated the plaintiff's net weekly income to be $3402 and the defendant's to be $1090. The parties' combined net weekly income, then, was $4492, of which 75.73 percent was attributed to the plaintiff and 24.27 percent was attributed to the defendant.[8] Pursuant to the guidelines, the court found the presumptive minimum child support obligation to be $686 per week. See *Fox* v. *Fox*, 152 Conn. App. 611, 623, 99 A.3d 1206, cert. denied, 314 Conn. 945, 103 A.3d 977 (2014). Thereafter, the court ordered the defendant to pay $166 per week in child support, i.e., his 24.27 percent share of the total support. The court also ordered, inter alia, the child support payment retroactive to the date of the plaintiff's service of the motion. This appeal followed.

On appeal, the defendant claims that the court erred in calculating the plaintiffs gross income. Specifically, he argues that the court erred by not "recogniz[ing] the evidence adduced at trial showing that the plaintiff received [a bonus] award for every year of her employment . . . ." We agree.

We first set forth the standard of review and applicable law governing the defendant's claim. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Notwithstanding the great deference accorded . . . a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 372, 999 A.2d 721 (2010).

"[General Statutes §] 46b-86 governs the modification or termination of . . . [a] support order after the date of . . . judgment. . . . [T]he applicable provision of the statute is § 46b-86 (a), which provides that a final order for . . . [child support] may be modified by the trial court upon a showing of a substantial change in the circumstances of either party. . . .

"Once a trial court determines that there has been a substantial change in the financial circumstances of one of the parties, the same criteria that determine an

initial award of . . . support are relevant to the question of modification. . . . More specifically, these criteria, as outlined in General Statutes § [48b-84], require the court to consider the needs and financial resources of each of the parties and their children . . . .

"Thus, [w]hen presented with a motion for modification, a court must first determine whether there has been a substantial change in the financial circumstances of one or both of the parties. . . . Second, if the court finds a substantial change in circumstances, it may properly consider the motion and, on the basis of the § [46b-84] criteria, make an order for modification." (Internal quotation marks omitted; footnotes omitted.) *Fox* v. *Fox*, supra, 152 Conn. App. 619–21.

In a child support proceeding, the court must fashion its initial financial orders in accordance with criteria contained in § 46b-84 (d).[9] See also *Bartel* v. *Bartel*, 98 Conn. App. 706, 711, 911 A.2d 1134 (2006) (acknowledging that § 46b-84 (d) "require[s] consideration of the parties' 'amount and sources of income' in determining the appropriate . . . size of any child support . . . award"). The legislature also created a commission to "issue child support and arrearage guidelines to ensure the appropriateness of criteria for the establishment of child support awards . . . ." General Statutes § 46b-215a (a); see also General Statutes § 46b-215b (a) ("[t]he child support and arrearage guidelines issued pursuant to section 46b-215a . . . shall be considered in all determinations of child support award amounts").

The primary purposes of the guidelines include: "To provide uniform procedures for establishing an adequate level of support for children . . . subject to the ability of parents to pay . . . [t]o make awards more equitable by ensuring the consistent treatment of persons in similar circumstances . . . [and] [t]o improve the efficiency of the court process . . . by giving courts and the parties guidance in setting the levels of awards." Child Support and Arrearage Guidelines (2015), preamble, § (c) (1) through (3), p. v. Importantly, the guidelines are based on the income shares model, which "presumes that the child should receive the same proportion of parental income as he or she would have received if the parents lived together." Id., § (d), p. v; see also *Unkelbach* v. *McNary*, 244 Conn. 350, 360, 710 A.2d 717 (1998) (recognizing public policy advanced by guidelines to "[account] for all income that would have been available to support the children had the family remained intact").

The guidelines define gross income as the "average weekly earned and unearned income from *all sources* before deductions . . . ." (Emphasis added.) Regs., Conn. State Agencies § 46b-215a-1 (11). Gross income includes, inter alia: "salary . . . commissions, bonuses and tips . . . [and] profit sharing, deferred compensation and severance pay . . . ." Id., § 46b-215a-1 (11)

(A) (i), (iii)–(iv). Net income is defined as "gross income minus allowable deductions." Id., § 46b-215a-1 (17).

The guidelines also permit courts, in appropriate cases, to enter "a supplemental order . . . to pay a percentage of a future lump sum payment, such as a bonus. Such supplemental orders may be entered only when: (i) such payment is of an indeterminate amount; and (ii) the percentage is generally consistent with the [guidelines] schedule . . . ." Regs., Conn. State Agencies § 46b-215a-2b (c) (1) (B). "A supplemental order treats the unknown future lump sum payment separately from the basic current support order and is intended to account only for those instances in which the parties have knowledge of an anticipated future lump sum payment of an unknown amount, such as a bonus." (Internal quotation marks omitted.) *Gentile* v. *Carneiro*, 107 Conn. App. 630, 643, 946 A.2d 871 (2008). However, our Supreme Court has stated that it broadly interprets the "definition of gross income contained in the guidelines to include items that, in effect, increase the amount of a parent's income that is *available for child support purposes*." (Emphasis added.) *Unkelbach* v. *McNary*, supra, 244 Conn. 360; see also *Tuckman* v. *Tuckman*, 308 Conn. 194, 213–14, 61 A.3d 449 (2013) (remanding "the . . . case for a determination of what portion of the defendant's income was available income for purposes of fashioning . . . child support orders").

With these principles in mind, we turn to the plaintiff's argument. The plaintiff relies on *Maturo* v. *Maturo*, 296 Conn. 80, 995 A.2d 1 (2010), primarily for the proposition that when annual bonus income fluctuates, it should be excluded from the gross income calculation. Therefore, the plaintiff argues, under *Maturo* the court properly excluded her bonuses from the gross income calculation. Specifically, the plaintiff focuses on the court's conclusion in *Maturo* that "[w]hen there is a proven, routine consistency in annual bonus income, as when a bonus is based on an established percentage of a party's steady income, an additional award of child support that represents a percentage of the net cash bonus also may be appropriate if justified by the needs of the child. When there is a history of wildly fluctuating bonuses, however, or a reasonable expectation that future bonuses will vary substantially . . . an award based on a fixed percentage of the net cash bonus is impermissible *unless* it can be linked to the child's characteristics and demonstrated needs." (Emphasis in original.) Id., 106.

The plaintiff's reliance on *Maturo* is misplaced. In *Maturo*, the trial court made a finding regarding the value of the defendant's annual bonus income. Id., 85. There the trial court abused its discretion, as explained by our Supreme Court, in awarding an "open-ended child support award of 20 percent, rather than 15.89 percent or less, of the defendant's variable bonus

[because that award] violat[ed] the guideline principles that a declining percentage of the combined net family income should be awarded as the income level rises and that the percentage of any future bonus allocated for child support should be 'generally consistent' . . . with the percentages established in the schedule in order to ensure consistency, uniformity and equity in the treatment of persons in such circumstances." (Citation omitted.) Id., 97. *Maturo*, therefore, does not stand for the proposition that when bonus income fluctuates it should be *excluded* when calculating a parent's gross income to fashion a child support award.

The court in this case made no findings as to whether any of the plaintiff's bonus income, i.e., her MICP, LTIP, or deferred compensation, could be used to calculate her gross income. Pierson testified that the plaintiff had elected in past years to defer part of her base salary or annual cash bonus into Hexcel's deferred compensation plan, that the LTIP stock options had "obvious economic value . . . [which] becomes W-2 income," and that the MICP cash bonus had been awarded to the plaintiff every year since 2009, and, in all "likelihood," the bonuses would continue in the future. Pierson did note that these bonuses were not guaranteed. Nevertheless, bearing in mind that the guidelines promote the principle that a "child should receive the same proportion of parental income as he or she would have received if the parents lived together;" Child Support and Arrearage Guidelines (2015), preamble, § (d), p. v; the fact that the plaintiff's bonuses are not guaranteed does not mean that a court should disregard them as a substantial source of income. Simply put, the court should have made a finding as to whether the plaintiff's bonus income was available for inclusion in the calculation of her gross income for the purpose of modifying child support.

The plaintiff's reliance on *Tuckman* v. *Tuckman*, supra, 308 Conn. 194, is also misplaced. In *Tuckman*, our Supreme Court addressed a defendant's claim that "the trial court improperly determined that her subchapter S allocated income should be included in her annual net income. Specifically, the defendant [asserted] that the trial court improperly relied on her personal tax returns showing the taxable income of an S corporation of which she [was] a shareholder. The defendant claim[ed] that the trial court improperly relied on that income in determining alimony and child support, despite the fact that it was not available to her." Id., 208–209. The court in *Tuckman* examined the defendant's tax returns and noted that "a substantial portion of her taxable income for the years 2005 and 2006 was income from her share of the S corporation . . . ." Id., 209. Because an S corporation's "capital gains and losses, for federal income tax purposes, pass through [it] to the individual shareholders . . . any federal income tax liability on capital gains is the responsi-

bility of the individual shareholder. . . . All of the earnings of such a company must be reported as individual income by its [shareholders]." (Citation omitted; internal quotation marks omitted.) Id., 209–10. In *Tuckman*, our Supreme Court noted the "[t]he trial court did not . . . make any finding as to what portion of the income reported on her tax returns was actually available to the defendant and what portion was merely '[pass] through earnings' of the S corporation. In fact, the defendant's testimony at trial indicated that none of the shareholder taxable income was available to her, but was retained by the corporation for investment. She testified that only her salary of approximately $85,000 was available income." Id., 210. Because "[t]he trial court did not make any findings as to the particular facts or circumstances of the S corporation of which the defendant was a shareholder," our Supreme Court in *Tuckman* remanded the case for a "determination of what portion of the defendant's income was *available income for purposes of fashioning . . . child support orders*." (Emphasis added.) Id., 213–14.

Through *Tuckman*, the plaintiff advances the notion that a court "should not presume that all deferred income or pass through income [is to] be used in the child support calculations." Indeed, a court should not make the presumption the plaintiff cautions against. The plaintiff's argument, however, misses the crucial point. *Tuckman* teaches us that a court should determine what portion of a parent's income from bonuses is available income to fashion a child support order.[10] See id., 213–14. Therefore, *Tuckman* in fact contradicts the plaintiff's position.

After a careful review of the record, including the exhibits submitted by both parties, we conclude that the court abused its discretion by failing to make any findings on how—if at all—the plaintiff's bonuses should be calculated for the purpose of fashioning child support orders. The guidelines clearly include bonus and deferred compensation in the definition of "gross income." Regs., Conn. State Agencies § 46b-215a-1 (11) (A). A court must consider "earned and unearned income from *all sources*" in calculating gross income to fashion child support obligations. (Emphasis added.) Id., § 46b-215a-1 (11). Therefore, we conclude that the court was obligated to make findings as to whether the plaintiff's bonuses constituted "income that would have been available to support the children had the family remained intact." *Unkelbach* v. *McNary*, supra, 244 Conn. 360.

Despite the evidence of bonuses consistently being received by the plaintiff since 2009, the court made no finding as to whether the plaintiff's bonuses were available as income for the purpose of modifying the child support award. Rather, the court calculated the combined net weekly income based on the parties' base

salaries and applied the result to the schedule. See Regs., Conn. State Agencies § 46b-215a-2b (f) (schedule of basic child support obligations). Because the court failed to make any findings regarding whether the plaintiff's bonuses were available income, we can only speculate as to whether the bonus income is too indeterminate and should not be included as gross income. See *Gentile* v. *Carneiro*, supra, 107 Conn. App. 641–42 ("the regulations make clear that only income with a reasonably ascertainable value may be included in gross income"). Therefore, we conclude that the court abused its discretion by modifying a child support order without determining whether the plaintiff's bonuses constituted income that should have been considered in the court's calculations. See *Harlow* v. *Stickles*, 151 Conn. App. 204, 212–13, 94 A.3d 706 (2014) (reversing modification of financial orders and remanding case for trial court's failure to consider "the defendant's auto allowance in its calculation of his income").

The judgment is reversed only as to the order modifying child support, which includes the orders with respect to unreimbursed medical and childcare percentages, and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.

[1] Because we reverse the court's judgment and remand the case for reconsideration of all the financial orders, we need not reach the defendant's other two claims.

[2] The support of only three children is at issue in this case because the eldest child had reached the age of majority.

[3] At trial, the following exchange occurred between the defendant's counsel and Pierson, explaining the type and quantity of the plaintiff's stocks that were vesting in the following years:

"[The Defendant's Counsel]: For 2014 will there be any awards that will vest in that calendar year?

"[Pierson]: Yes.

"[The Defendant's Counsel]: How many stocks will vest in 2014?

"[Pierson]: [T]here will be . . . 3120 options that will vest on January 31st. There will be 2300 that will vest on January 30th. And there will be 1636 that will vest on January 28th.

"[The Defendant's Counsel]: And that is in 2014?

"[Pierson]: That's correct. And then on restricted [stock] units there will be 627 lapsing on January 31st. . . . I believe it is 480 on January 30th of 2014. And it looks like 442 in 2014. And then on performance restricted stock units . . . it would be 1882 performance restricted stock units in 2014."

* * *

"[The Defendant's Counsel]: And for 2015, can you tell me how many stocks will vest for 2015? And this is the last year. . . .

"[Pierson]: Okay, 1636 options will vest in 2015. And then a separate tranche of options, 2301, will vest January 30, 2015. With respect to restricted stock, 441 shares will vest in 2015. And then a separate tranche of 400—it looks like 81—will vest in 2015. And then with respect to performance restricted stock, it looks like 1482 will vest in 2015."

[4] The following exchange occurred between the court and Pierson, who explained how Hexcel's nonqualified plan operated:

"The Court: So you are saying this nonqualified retirement deferred compensation plan is not owned by the plaintiff until when? What conditions have to be met before it is vested in the ownership of the plaintiff? . . .

"[Pierson]: The nonqualified plan is permitted to exist, and as a condition the assets of the employee have to have a substantial risk of forfeiture. That is how you get these plans created. Now that substantial risk of forfeiture can be mitigated somewhat. If the company were to be acquired . . . in a

hostile takeover and . . . new management . . . decided that they were going to take an account balance and use it to buy a company check . . . . That is not permitted under the terms under which this nonqualified plan exists, because we have what is called a rabbi trust that affords the participants protection in that event.

"The Court: Okay.

"[Pierson]: If, on the other hand, Hexcel Corporation were to go into receivership or into bankruptcy, the money in all of these accounts would be subject to the claims of creditors, and the assets are not protected in the event that that would occur.

"The Court: Unlike a traditional qualified 401(k) where you have the protection?

"[Pierson]: Correct."

We note that "[a] rabbi trust, so called because its tax treatment was first addressed in an [Internal Revenue Service] letter ruling on a trust for the benefit of a rabbi, Private Letter Ruling 8113107 (Dec. 31, 1980); see also IRS General Counsel Memorandum 39230 (Jan. 20, 1984), is a trust created by a corporation or other institution for the benefit of one or more of its executives (the rabbi, in the IRS's original ruling)." *Bank of America*, *N.A.* v. *Moglia*, 330 F.3d 942, 944 (7th Cir. 2003); see also *Synovius Trust Co.*, *N.A.* v. *Bill Heard Enterprises*, *Inc.* (*In re Bill Heard Enterprises*, *Inc.*), 419 B.R. 858, 864–65 (Bankr. N.D. Ala. 2009) ("A rabbi trust, 'an irrevocable trust for deferred compensation,' is one mechanism commonly used to set aside deferred compensation amounts without jeopardizing the 'unfunded status' of a [deferred compensation] plan. Funds held in a rabbi trust 'are out of reach of the employer, but are subject to the claims of the employer's creditors in the event of bankruptcy or insolvency.' " [Footnote omitted.])

[5] The plaintiff conceded that it was possible to achieve a bonus if the new performance criteria were met.

[6] The memorandum of decision also disposed of the parties' motions for contempt. Neither party has challenged the propriety of those determinations on appeal, and, therefore, only the motion for modification is before this court.

[7] The court found that both parties' worksheets contained inconsistencies "skewed to support their respective arguments for a deviation or adjustment in their favor." The court acted within its discretion in rejecting the worksheets. *McKeon* v. *Lennon*, 155 Conn. App. 423, 435, 109 A.3d 986 ("[a]s it is the exclusive province of the trier of fact to resolve credibility determinations, the court properly determined that the plaintiff's financial affidavit should be given little weight, given the various inconsistencies it found"), cert. granted on other grounds, 317 Conn. 901 (2015).

[8] Due to a scrivener's error, the memorandum of decision incorrectly states that the parties' combined net weekly income totaled $4490.

[9] General Statutes § 46b-84 (d) provides: "In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, *amount and sources of income*, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child." (Emphasis added.) Section 46b-84 (f) was recently amended by No. 15-69, § 42, of the 2015 Public Acts (effective June 19, 2015). This amendment is unrelated to any issue presented in this case.

[10] Analogous to the pass through income at issue in *Tuckman*, the plaintiff testified that, even though some of the stocks had vested and were considered taxable income, she did not "cash out" $178,000 worth of stock options and did not have access to the money because it was "held in [Hexcel's] account." The plaintiff conceded, however, that she could have "[l]egally . . . cashed out the stock," but she refrained from doing so because she required "special clearance" and was "[discouraged] . . . from doing it because it looks bad to the [c]ompany if [e]xecutives are cashing in their stock."