[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The principle issue in this contested dissolution trial is whether or not voluntary termination by a party from a second job in his chosen field, reducing his earnings, but retaining a full-time position in that same chosen field, invokes the earning capacity rule.
After considering the evidence, the testimony of the parties, and the exhibits, the court finds the following facts:
The parties were married in New Rochelle, New York on March 6, 1982. The plaintiff has resided continuously in the state of Connecticut one year next before the date of this complaint. The parties have not received any assistance from any governmental agency. Two minor children are issue of this marriage, Elizabeth Brandstetter, born September 15, 1982, and Kathleyn Brandstetter, born February 8, 1985. No other minor children have been born to CT Page 14406 the plaintiff since the date of the marriage. The marriage has broken down irretrievably, and there is no hope of reconciliation.
The plaintiff wife is 41 and in good health. The marital home was sold during the pendency of this matter, and she moved to a house that she purchased at 49 Riverside Avenue, Riverside, Connecticut. The two minor children reside with her. She is employed by FLIK International Corporation in Rye Brook, New York as a nutrition specialist and public relations spokesperson. She earns $52,000 dollars annually. She received a B.S. in nutrition from Miami University of Ohio and worked one year at Massachusetts General Hospital in Boston as a registered dietician. She enrolled in an MBA program at the University of Chicago and moved to Chicago. She moved back after two months to Boston and took graduate courses at Boston University. While employed at Massachusetts General Hospital she met the defendant. He had received a pulmonary fellowship at Massachusetts General Hospital. She received an MBA from Pace University in 1989.
The defendant husband is 51 and in poor health. He was diagnosed with metastatic colon cancer in 1989. His health has deteriorated. He is currently on the active list for a liver transplant. His health will be addressed further. The defendant is a pulmonary physician employed by Sound Shore Medical Center of Westchester in New Rochelle, New York. Sound Shore Medical Center of Westchester was formerly known as the New Rochelle Hospital. He was hired as the Assistant Director of Medicine in 1982. Since 1988 he has been the director of the Fifth Pathway Program. He has been the Associate Director of Medicine since 1991. Since 1991 he has been the Chief of the Critical Care Department. He has been the Director of Medical Education since 1993. He was appointed Medical Director of Complementary Health Care in June 1997. He is paid $187,000 per year by Sound Shore Medical Center of Westchester.
The defendant received his undergraduate degree from CCNY in 1974 after attending five years of night school. He received his medical degree from Albert Einstein Medical College in 1977 in an accelerated three year program. He interned at the New York Hospital Cornell Medical Center from 1977 to 1979. From 1980 to 1982 he was a pulmonary care resident at Massachusetts General Hospital and since July 1, 1982 has been connected with New Rochelle Hospital, now Sound Shore Medical Center of Westchester, in various capacities. CT Page 14407
This is the defendant's second marriage. His first marriage ended in a divorce. He had four children, issue of that marriage, who were 22, 25, 27 and 28 as of the commencement of this trial. At the time of the parties 1982 marriage, his oldest boy lived with the defendant, and his other three children spent weekends with the defendant in the New York area. The plaintiff wished to stay in Boston but acceded to the defendant's wishes to be closer to his four children. The defendant then obtained his current employment. It was the plaintiff's intention to start in the nutrition section of the New Rochelle Hospital. She had difficulties with the her first pregnancy and was not able to commence that job.
The defendant was permitted to have a private practice specializing in pulmonary and critical care medicine in addition to his regular duties at New Rochelle Hospital. "During the term of your employment pursuant to this agreement, you may conduct a private practice so long as such practice does not interfere with your duties and responsibilities hereunder." Exhibit 13. The plaintiff did the billings and ran the financial portion of the defendant's private practice. The defendant's private practice office was at the hospital and consisted of a waiting room and an office. There was no testimony of an examination room. The plaintiff set up the defendant's billing system and accounting system, and kept track of the patients' insurance filings for accounting and tax purposes, as well as calculated and paid the family estimated income taxes. She performed all these services from the inception of his private practice in mid 1982 until the defendant left the marital home in the summer of 1996. For a number of years she was paid $25,000 for this work. From this she made her IRA and Keogh investments. At the commencement of this law suit in December, 1996, the plaintiff no longer was performing those tasks.
The defendant's private practice operated out of an office in the hospital. At all times that he was engaged in private practice, he fulfilled the obligations and duties of the various positions that he held with Sound Shore Medical Center of Westchester.
The plaintiff handled all the family income tax returns. She hired a tax attorney in New York City and met with the attorney regularly for tax planning and tax preparation purposes. She was responsible for all the family finances including making and CT Page 14408 recording investments. As a result she was familiar with the defendant's private practice income.
At the time of the marriage the plaintiff owned a car, a diamond necklace from her grandmother and some furniture. She had no debts. The defendant then owned a car, furniture, and had a half interest in a house at 2822 Sampson Avenue, Bronx, New York which he co-owned with his first wife. He had obligations toward his first family.
The parties were able to save and in September of 1983 purchased the marital home at 114 Iron Gate Road, Stamford, Connecticut. The purchase price was $280,000. Some $80,000 to $100,000 cash was paid, and the balance was mortgaged. The cash down payment was saved during the marriage by the parties. At the time of trial the marital home was on the market. During the trial, the house sold and funds were held in escrow. Exhibit 18, the closing statement for the Iron Gate Road house, discloses the gross sales price to be $461,000 and the net sales proceeds to be $372,963.89. Some of these funds were used by the plaintiff to purchase her current house in Riverside.
At the time of trial, the parties had not filed their 1996 income tax returns. Neither party disputes that the gross annual salary earned by the defendant from Sound Shore Medical Center of Westchester is $187,000, as set forth in his financial affidavit. The W-2 on their 1994 tax return shows $174,137 salary from the hospital. The 1995 W-2 shows $177,175.
The defendant filed a Schedule C for his private practice in 1994 and 1995. In 1994 his gross disclosed in Schedule C was $230,124 and he netted $201,464 after expenses, prior to taxes. In 1995 his Schedule C discloses $207,000 gross and $174,040 net. These earnings are in addition to his W-2 salary from Sound Shore Medical Center of Westchester.
The defendant's November 2, 1985 employment agreement with New Rochelle Hospital was offered as Exhibit 13. Paragraph Four states as follows: "During the term of your employment pursuant to this agreement you may conduct a private practice so long as such practice does not interfere with your duties and responsibilities hereunder." During 1994, according to the defendant's testimony, his daily schedule began at 6:30 am. when he would see private patients or assist with an operation. Later in the day, upon completion of his regular duties for the CT Page 14409 hospital, he would visit private patients on his rounds. He estimated he worked a 75 hour week in both his hospital duties and private practice. He now works slightly more than a 40 hour week. His workday commences at 8:00 a.m.
The defendant's medical circumstances are of importance. The first onset of his current medical problems occurred in 1974-1975. The defendant suffered from a disease and its symptoms were progressive. He had surgery which removed bodily organs that were replaced with mechanical devices. Though from time to time he appeared to be asymptomatic, at all times he was suffering from the original disease. He continuously had abnormal lab tests. His physician stated that his medical condition has deteriorated. There is substantial jeopardy that his liver will fail. He is currently on a liver transplant list. Despite this medical condition and its deteriorating nature, the defendant has been able to engage in the full-time duties of his hospital employment.
The defendant testified extensively as to the reason why he terminated his private practice. He was engaged full-time in his private practice in all of 1994. Toward the end of 1995 his private practice diminished. His net income fell from $201,464 in 1994 to $174,040 in 1995. He furnished a number of reasons for terminating his private practice: (1) Both parties had agreed many years ago, that he would slow down his private practice when he was fifty and would terminate the practice shortly thereafter. The contemporaneous events contemplated for the termination of his private practice were (a) the mortgage on the North Carolina home was paid off, (b) sufficient money was set aside for the children, and, thereafter, (c) the only financial issues remaining would be retirement. The parties placed their retirement plans on a sheet which was offered in evidence. Exhibit 10. Exhibit 10 showed the decrease in the number of patients by agreement of the parties; (2) Psychological and physical pressure on the defendant was too much by reason of the intensive nature of the treatment of his patients as well as the recent suicide of a friend in Boston; (3) He did not do accurate billings, and the billings were not completed for all of 1995; (4) He was told by a psychologist that he was manic-depressive. He was placed on Lithium. He was told by the psychologist that it was not good for his mental health to work long hours; (5) There was no "vision" anymore for his working a 75 hour week, and (6) Medicare patients were 60-70% of his billings and his income from this source was decreasing along with the attendant payment CT Page 14410 problems. In addition, there was extensive evidence concerning the limitations placed on the defendant by his complicated medical history.
The defendant bases his Claims for Relief solely on his current earnings of $187,000 per year working full time in the various administrative capacities for Sound Shore Medical Center of Westchester. The plaintiff bases her Claim for Relief based upon the 1994 and 1995 earnings of the defendant which include substantial earnings from his private practice. These two conflicting Claims for Relief are the major issue in this case and bring to bear the issue of earning capacity.
"In marital dissolution proceedings, under appropriate circumstances the trial court may base financial awards on the earning capacity rather than the actual earned income of the parties." Hart v. Hart, 19 Conn. App. 91, 94, (1989); Lucyv. Lucy, 183 Conn. 230, 234 (1981), Johnson v. Johnson,185 Conn. 573, 576 (1981). "Such circumstances include those where there is evidence that a party voluntarily quit or avoided employment in his or her field of expertise and where there is evidence of that party's previous earnings. Miller v. Miller, 181 Conn. 610,612-13 (1980); McKay v. McKay, 174 Conn. 1, 2 (1977)." Paddock v.Paddock, 22 Conn. App. 367, 371 (1990). "Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health". Lucy v. Lucy, supra, 183 Conn. 234. "A periodic alimony order, disobedience of which invokes the penalty of contempt, should not exceed the current financial ability to meet it of the party on whom it is imposed . . ." Rubin v. Rubin,204 Conn. 224, 237 (1987). "It is horn-book law that when a spouse can afford to pay for support and alimony is a material consideration in the court's determination as to what is a proper order . . . This must be taken to mean income reasonably available to the support paying spouse. The ultimate inquiry is the obligor's earning capacity." Misiorski v. Misiorski,11 Conn. App. 463, 469 (1987).
This court has not been able to find a case in the state of Connecticut that parallels the facts of this case. A typical earning capacity case is Hart v. Hart, supra, 10 Conn. App. 91. In Hart, the defendant had a degree in operations management and held a number of positions in the field of quality control CT Page 14411 engineering. His last employment in quality control was in 1983 at an annual salary of $39,000. Since leaving that position, the defendant, no longer engaged in quality control engineering, earned $8,000 cutting lawns from May to October. The defendant had only two job interviews for quality control positions since 1984. The trial court found it appropriate to base financial awards on the earning capacity of the defendant rather than his actual earned income. The court found evidence that the defendant wilfully depleted his earnings and there was evidence of the defendant's previous earnings. Id.
In this case the plaintiff seeks to apply the earning capacity rule to a circumstance where the defendant has not avoided employment in his chosen field. Furthermore, the defendant is actively engaged in a full-time position in that field, a job that he had held for many years. He is earning a substantial salary. It is equally clear that his earnings have substantially decreased by the fact that he has terminated his private practice.
In Cipriano v. Cipriano, Superior Court, judicial district of New London at Norwich, Docket No. 108505, (December 20, 1996, O'Connell, J.), 1996 Ct. Sup. 6859, the defendant, 45 years old, had been operating his own plumbing and heating business for the previous twelve years earning $650 per week gross. He was also holding a second job working 8 hours a night at the Mohegan Sun Casino earning $320 per week gross. The defendant testified that he could not maintain both jobs working sixteen hours a day. He took the Mohegan Sun Casino job in the hopes that he would get into the plumbing department, to expand his plumbing and heating business. The trial court found the earning capacity of the defendant was $650 per week thus not considering the income from his second job.
In Wolf v. Wolf, 39 Conn. App. 162 (1995), the defendant wife was a radiologist in private practice. She decided to change her medical speciality. At trial she was a resident in psychology earning a net of $23,600 per year. Upon completion of her psychiatric residency her earnings were projected to be $140,000 per year. The court found that had she instead chosen to utilize her training in radiology, the defendant would have an earning capacity of $422,005 per year. The court based its three-year alimony award on the defendant's earning capacity, "not necessarily on her stated desires regarding employment." Id. 169. CT Page 14412
The most recent case on this subject is Unkelbach v. McNary,244 Conn. 350 (1998). In that case, the court determined that the custodial parent left a job paying $60,000 per year for a job paying $41,000. The court nevertheless held that the custodial parent was working up to her earning capacity because the greater number of hours required by the higher paying job interfered with her responsibility as the primary caretaker of the children. When she was employed from 1994 to 1995 earning an annual salary of $60,000 she was working 60 to 70 hours per week. She left her employment voluntarily for an alternate full-time position involving fewer hours and paying only $41,000 per year. "On the basis of this evidence, the trial court reasonably could have concluded that the plaintiff was employed at full capacity, and, as a result, no deviation from the guidelines was justified. Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn, considering such things as his vocational skills, employability, age and health." Unkelbach v.McNary, supra, 244 Conn. 372.
Lucy v. Lucy supra, 183 Conn. 234, states that the health problems of an individual could prevent the court from finding that they are not working to his earning capacity. The most cited case in this area is Miller v. Miller, supra, 181 Conn. 610, which permits the use of earning capacity in cases where; (1) the party wilfully depleted his earnings with a view toward denying or limiting the alimony to be paid or (2) the earnings of the party are voluntarily depleted so as to deprive the spouse of financial support. Id., 612. Whitney v. Whitney, 171 Conn. 23, 28
(1976)
The plaintiff cites three cases in support of her claim that this court should base its financial orders on the defendant's income consisting of his current hospital salary of $187,000 together with the earnings from his former private practice of a similar amount. Venuti v. Venuti 185 Conn. 156 (1981), Stearns v.Stearns, 4 Conn. App. 323 (1985) and Vandal v. Vandal,31 Conn. App. 561 (1993). None of these cases involved a party who was working full time in his field of expertise earning a salary from a large institution where creative bookkeeping to lessen earnings cannot occur. None of these cases involve the applicability of a second job terminated in part for health reasons. Venuti involved an airline pilot who reduced his income presumably by flying less than his full time allotment of hours. Stearns involved a CT Page 14413 self-employed businessman whose actual earnings were in question.Vandal involved disputed earnings in which the defendant's C.P.A. income claims were not supported by his tax returns.
This court finds as follows: (1) the defendant is employed full-time in his chosen field; (2) He is earning a salary appropriate to that full-time employment: (3) There is no evidence that he wilfully depleted his earnings with a view toward denying or limiting the alimony or child support to be paid; and (4) There is no evidence that he voluntarily depleted his earnings so as to deprive the spouse of financial support. The court concludes that the earnings from his previous private medical practice should not be considered in making financial orders. The facts of this case do not invoke the earning capacity rules. The defendant's full-time salary of $187,000 per year, from the hospital, is his principal source of income and the financial awards shall be based on those earnings. The facts are markedly unlike the medical earning capacity case in which a change in surgical specialties occurred. Wolf v. Wolf, supra89 Conn. App. 167-68. The facts are also unlike a medical doctor licensed in three states who elected to become an anatomical pathologist in a research hospital as a junior staff member foregoing his "high potential in earning power" in other medical fields. Yates v. Yates, 155 Conn. 544, 546-47 (1967)
His earnings from his prior private medical practice shall not be calculated into the financial awards. In the event that the defendant does become re-employed in a private medical practice, the plaintiff can move for modification of the periodic awards. General Statutes § 46b-86. This result conforms with the recent case of Lotz v. Lotz, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. FA93 0302896 (July 27, 1994, Petroni, J.) 1994 Ct. Sup. 7074, 7079.
This case is also consistent with D'Amore v. D'Amore
involving a full-time public school principal who had additional jobs administering a vocational training program for inner city youths, training retarded adults for Goodwill Industries, tutoring pupils as well as painting and carpentry jobs. The principal was required to pay alimony and child support only on his full time public school principal's salary. D'Amore v.D'Amore, Superior Court, judicial district at Fairfield at Bridgeport, Docket No. FA94 0316846S (May 23, 1995, Petroni, J.)1995 Ct. Sup. 4993, 4998. CT Page 14414
The defendant is working full time in his chosen profession. It is a job that he has held for 16 years in which he works more than a 40-hour week. General Statutes Section 31-76c. There was no evidence that the defendant was underpaid for his current services by Sound Shore Medical Center of Westchester.
After consideration of the evidence findings, General Statutes §§ 46b-62, 46b-81, 46b-82, 46b-83 and46b-84 and O'Neill v. O'Neill, 13 Conn. App. 300
(1988), the court enters the following orders:
1. The marriage is dissolved on the grounds of irretrievable breakdown.
2. The custody of the two minor children is awarded to the parties jointly. The minor children shall reside with the plaintiff subject to rights of reasonable access by the defendant.
3. The defendant shall pay to the plaintiff as periodic alimony the sum of $2,800 monthly, payable in advance on the first day of each calendar month commencing January 1, 1999. The first alimony payment shall include prorated alimony from the date of this decision to December 31, 1998. The periodic alimony shall terminate upon the first of the following events to occur: the death of the defendant, the death of the plaintiff, the plaintiff's remarriage or March 1, 2007. The periodic alimony will terminate no later than March 1, 2007 due to the defendant's health, and the plaintiff's ability to invest the proceeds from the property distribution in growth assets which by March 1, 2007 will make her able to support herself from her earnings and increase her income from invested appreciated assets. In addition, as of March 1, 2007 the defendant will be 60 and his ability to produce continued high earnings will substantially diminish. This order of alimony is based on the defendant's current salary from Sound Shore Medical Center of Westchester.
4. The defendant shall pay to the plaintiff the sum of $2,000 per month as child support in advance on the first day of each calendar month commencing January 1, 1999. The first child support payment shall include prorated child support from the date of this decision to December 31, 1998. On September 1, 2003 the defendant will pay to the plaintiff CT Page 14415 the sum of $1,500 per month as child support.
5. The plaintiff shall be entitled to claim the tax exemption of the oldest child and the defendant shall be entitled to claim the tax exemption of the youngest child.
6. The real property located at 184 Ocean Way Court, Duck, North Carolina, shall be placed on the market and sold immediately. The Superior Court shall retain jurisdiction over the terms and conditions of the sale. After payment of the first mortgage, unpaid real estate taxes, brokerage commission, if any, and actual closing costs and adjustments, the balance of the net proceeds and the remaining proceeds of the real property rent account shall be divided equally. The defendant shall make all the sale arrangements but the sales and listing price and other terms and conditions of sale shall be by mutual decision of the parties. The plaintiff shall have the right of first refusal on any offer made and five business days to exercise her acceptance of said offer under this right of first refusal.
7. The defendant shall manage the real property at Duck, North Carolina productive of rent. After the payment of the usual expenses, the net proceeds shall be retained by the defendant to be divided equally between the parties upon the sale of the premises. In the event the rental proceeds are not adequate to pay for the usual expenses, each party shall contribute squally to the real property rent account maintained by the defendant at Chase Manhattan Bank in sufficient sums to pay said usual expenses. The defendant shall be the only signator on said Chase Manhattan Bank account.
8. The parties shall share alternatively the two one-week's ownership right of occupancy at the Duck, North Carolina house rent free. The occupant shall pay for utilities and other occupancy costs for that one week period. The first right of occupancy is awarded to the party who did not last occupy the Duck, North Carolina house.
9. The defendant, during his lifetime, shall pay for and maintain the following existing life insurance policies naming the plaintiff as irrevocable primary beneficiary: American College of Surgeons group policy in the face amount of $250,000 and Sound Shore Medical Center of CT Page 14416 Westchester group life coverage in the face amount of $100,000. This obligation shall continue for so long as the defendant is obligated to pay periodic alimony or child support. The defendant shall not borrow against, pledge, hypothecate or otherwise reduce said coverage. Upon written request by the plaintiff, no more than once each calendar year, the defendant shall provide proof of compliance with this insurance order. The defendant will continue to own and control the A.M.A. $100,000 accidental death policy on his life.
10. The plaintiff shall become the owner of the following assets, free and clear of any claims by the defendant:
 a) The real property at 49 Riverside Avenue, Riverside, Connecticut
 b) The following Fidelity accounts: Fidelity Brokerage, Fidelity Cash Reserves, Fidelity LTD Muni, Fidelity Value Fund, and Fidelity Bank Reserve Account
c) Chase Manhattan bank account — $800
d) 1974 Mercedes automobile
e) 1996 Ford Explorer automobile
 f) One-half of the Patrick Montuari and Beverly Montuari loan in the approximate amount of $4,000
g) Lucent Technologies stock
 h) 75,000 miles on the American Express air travel program with equitably divided expiration dates
i) Roxbury Swim Tennis Club bond and membership rights
j) First County Bank account
 k) Smith Barney account in plaintiff's name in the approximate amount of $30,000
11. The defendant shall become the owner of the following assets, free and clear of any claims by the plaintiff: CT Page 14417
 a) The remaining proceeds of the sale of the former residence at 114 Iron Gate Road, Stamford, CT together with accrued interest on deposit in an interest-bearing escrow account with an initial deposit of $185,047.25 on April 13, 1998
 b) Smith Barney Money Market and checking account #35922619
 c) Defendant's undivided one-half interest in the real property located at 2822 Sampson Avenue, Bronx, New York
d) 1988 Mercedes 350 SEL automobile
e) Baseball memorabilia collection
 f) One half of the Patrick Montuari and Beverly Montuari loan in the approximate amount of $4,000
g) All stock, holdings and interest in Phase Out of America
 h) Remaining miles on the American Express air travel program
12. For tax year 1997, the defendant shall be entitled to all mortgage, interest and real estate tax deductions for both the Connecticut and North Carolina properties from January 1, 1997 to April 14, 1997. The plaintiff shall be entitled to said tax deductions for the Connecticut property for the balance of the 1997 tax year and until the house closing date. The parties shall share equally any deductions for the North Carolina property for the balance of 1997 and until that house is sold. Appropriate credits shall be made between the parties in the event that deductions other than set forth in this paragraph have been taken by either party on their 1997 income tax returns.
13. There are two custodial accounts for the children. The plaintiff is the current custodian of both accounts. The defendant shall become the custodian of the account for Elizabeth. The funds in both accounts shall be dedicated to and used for the exclusive benefit of the children in accordance with the Connecticut Uniform Transfers to Minors Act, General Statutes § 45a-546 et seq. Each party shall CT Page 14418 account to the other regarding the status of said accounts.
14. The defendant shall pay to the plaintiff the following sums:
a) $15,000 for counsel fees
 b) $8,000 for moving costs from Stamford to her current house in Riverside
 c) One half of the oil tank insurance and septic tank bills for the Stamford real property
 d) $3,200 as requested in paragraph 13 of the plaintiff's June 23, 1998 Claim for Relief
 e) $2,222 for one half of the accountant's fee and marital house fix-up costs as requested in paragraph 12 of the plaintiff's June 23, 1998 Claim for Relief
15. The defendant shall endorse to the plaintiff the three insurance reimbursement checks referred to in both parties' Claim for Relief
16. The defendant shall keep and maintain or cause to be kept and maintained medical and hospitalization insurance for the benefit of said minor children reasonably equivalent to the current policy now in effect for so long as said insurance is available to him and the children qualify as dependents. The provisions of General Statutes § 46b-84(d) shall apply. All unreimbursed medical, orthodontia, psychiatric, psychological and dental expenses for said children shall be divided equally between the parties. Except in the event of an emergency all elective surgery, psychiatric, psychological and dental treatment shall not be undertaken without the joint agreement of the parties.
17. The plaintiff is presently insured under certain medical policies made available to the defendant and his family. The defendant shall take all steps necessary to assist the plaintiff in the continuation of this insurance by transferring her coverage from group policies to an individual policy to the maximum extent permitted by law or policy. The plaintiff shall be responsible for the cost of said insurance. CT Page 14419
18. The parties have represented to the court that they have equitably divided the personal property located in the marital home at Iron Gate Road, Stamford, CT, which martial home has been sold. The parties have not divided the personal property located in the Duck, North Carolina property. The defendant is claiming personal property set forth in Exhibit 23. This court will retain continuing jurisdiction to divide all personal property of the parties not yet agreed upon as divided. This matter is referred for mediation. Each party shall be entitled to inspect the other party's residence for the purpose of compiling a list, description and valuation of personal property.
19. The plaintiff shall retain her ownership in the following retirement accounts in her name: (The values set forth in this order are shown in the plaintiff's financial affidavit dated June 23, 1998)
 a) Fidelity Growth-Keogh Profit Sharing #T058372903 — $99,597.56
 b) Fidelity Canada Fund-Keogh Money Purchase #T057921660 — $40,640.01
c) Fidelity Capital Income IRA — $19,392.17
d) Fidelity Low Priced Stock IRA — $14,379.03
20. The defendant shall transfer to the plaintiff by way of a Qualified Domestic Relations Order Forty (40%) percent at the current value of the following three retirement accounts: (The values set forth in this order are shown in the defendant's financial affidavit dated June 23, 1998)
 a) Smith Barney-Keogh Money Purchase #35966118 — $532,849
 b) Smith Barney Profit Sharing Plan #3S966119 — $643,820
c) Smith Barney IRA #35960754 — $21,312
It is the assumption of this Order that no contributions or withdrawals have been made after June 23, 1998 and it is the intention that all three accounts are divided Forty (40%) CT Page 14420 percent to the plaintiff as of the date of transfer. The Superior Court will retain continuing jurisdiction over the terms and conditions of any Qualified Domestic Relations Order required to put this order into effect.
21. The defendant shall retain his ownership in the following pension plans through Sound Shore Medical Center of Westchester in his name: (The values set forth in this order are shown in the defendant's financial affidavit dated June 23, 1998).
a) Cash balance benefit — $38,185.02
b) Grand fathered benefit — $71,439.86
The plaintiff shall be treated as the surviving spouse for the purpose of the pre-retirement spouse benefits in the event of the defendant's pre-retirement death and be entitled to the Automatic Surviving Spouse benefit regardless of the definition of"spouse" contained in Exhibit 14.
22. The defendant shall hold the plaintiff harmless for any and all joint income tax deficiencies, audits, interest and penalties. The joint 1996 refund, if any, from federal and state tax returns combined shall be divided equally. All other joint refunds shall belong to the defendant.
23. Each party shall pay for the liabilities and debts listed in their respective financial affidavits and hold the other party harmless therefrom.
24. All parties shall provide and sign all documents necessary to put these Orders into full force and effect.
25. The plaintiff's attorney will prepare the Judgment File and the Qualified Domestic Relations Orders for approval and signature by the defendant's attorney.
BY THE COURT
Kevin Tierney, J. CT Page 14421