[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter comes before the Regional Family Trial Docket on a complaint seeking dissolution of the marriage of the parties and other relief. The matter originates in the Danbury Judicial District. After the case had been referred to this docket, the parties reached agreement on child custody and visitation issues, subject to the approval of the court. The parties signed a written Stipulation As To Custody And Visitation dated December 6, 2000. It was approved by the court on December 7, 2000 and will be incorporated by reference as part of the court's decree. Over a period of 3 days the parties tried to the court financial issues involving child support, health insurance, payment of children's health expenditures, alimony, division of assets and liabilities, as well as counsel fees. The court heard testimony from the parties, two real estate appraisers, and a certified public accountant. Many exhibits were entered into evidence. The court has considered all of the credible evidence presented to it and has carefully considered all of the statutory criteria for the orders to be issued. The statutory criteria will not be restated here. The court makes the following findings of fact and orders.
The court finds that it has jurisdiction over the marriage. One party has resided in Connecticut continually for more than one year prior to the bringing of this action. The parties were married on July 2, 1983 in New York City, New York. They have three minor children issue of the marriage, namely Jason Thomas Bonadio, born December 22, 1983; Gregory Ethan Bonadio, born September 15, 1990; and Andrew Wyatt Bonadio, born November 16, 1994. Jason is currently committed to the Department of Children and Families, and his custody and support are not at issue in this action. No other minor children have been born to the wife since the date of the marriage. The parties have not been recipients of state assistance. The marriage between the parties has broken down irretrievably with no hope of reconciliation. The causes for the breakdown are complex. Both parties have had individual and joint counseling in an effort to save the marriage. Neither party is found to be at fault for the breakdown. CT Page 3456
The plaintiff, Nancy K. Bonadio, is 46 years of age. Prior to the marriage she earned a Bachelor of Arts degree from the University of New Hampshire with a major in art, concentrating in drawing and painting. She has never made use of her art education in employment. This is her first marriage. Her general health is good.
The plaintiff had no assets at the time of the marriage. At the time of the marriage, the plaintiff was working at an advertising agency in New York City. She left that employment within a few months to have her first child. She has been a homemaker throughout the marriage and has had primary responsibility for caring for the children and the smooth and orderly running of the household. She has not been employed outside the home except for very brief periods as a waitress, a temporary office worker, and, since November 2000, as a retail sales person at Filene's at 15-20 hours per week. She is paid at the rate of $8.00 per hour and averages $136 in gross wages per week. The plaintiff intends to look for full-time employment, possibly after taking courses in the computer field. However, she is still undecided about the kind of work she will do, or what kind of earnings she can expect.
The defendant, Thomas Bonadio, is 46 years old. This is his first marriage. At the time of the marriage he had a high school diploma plus one year of college and was working full time in New York City as a computer programer. In 1986 he earned a Bachelor of Science degree in business from Chadwick University as a result of correspondence courses taken during the marriage. He has been employed throughout most of the marriage at a series of jobs with companies in the New York and Connecticut area. In 1995 he formed his own computer consulting company and has been self employed ever since. He had no assets at the time of the marriage except for a one-half interest in 60 acres of vacant land in Broome County, New York, which his father bought and gifted to the defendant, in part. The defendant inherited the other one-half interest in the property from his father in 1996. The value of this one-half interest at the time of the marriage is unknown. The property is narrow with a power line running down the middle. It is located adjacent to the property where his mother lives. He has never tried to sell or develop the property. The only evidence of value is the assessment for real estate tax purposes. The court accepts this valuation and finds that the present fair market value is $46,000. The parties paid one-half of the real estate and school taxes on the property until the death of the defendant's father. Thereafter, they paid the full amount of these taxes which presently total about $1,300 per year.
The defendant operates his computer consulting business under the name Spur Software, L.L.C. The defendant is the sole manager and has a 99% CT Page 3457 membership interest in the company, while the plaintiff has a 1% interest. The plaintiff made no contributions to the company. Spur Software has no employees other than the defendant.
Since October 2000, the defendant has been consulting for a company named Eagle Global Logistics located in Houston, Texas. He is paid at the rate of $90 per hour as an independent contractor. He is in Houston during the week and returns to Danbury on Friday night for the weekend. He must pay all of his travel and living expenses in Houston as well as $6 per hour as a contract administration fee. The business expenses shown on his financial affidavit for air fare, parking, car rental, hotel, meals and contract administration fee total $1,415.50 per week. He presently has gross earnings of $3,150 per week with an adjusted gross, before taxes, of $1,734.50. The defendant hopes that he will eventually be able to do some or all of his work for this job from his home. If he is able to eliminate some or all of the trips to Houston it will increase his adjusted gross earnings by reducing or eliminating the business expenses cited above. However, because of a change in management at the Houston company, he does not know when he will be able to begin doing some of his work from his home.
The defendant took the position with Eagle Global Logistics in October 2000. He had been unemployed for about 3 months and needed steady work in order to pay his pendente lite orders. Although he had to travel to Houston every week, he thought there was potential that he would eventually be able to do some or all of his work from his house. Also, being in Houston during the week was attractive to him at that time because he and his wife were still living in the same house and there was a great deal of friction.
Under the Child Support and Arrearage Guidelines, the child support obligation first is determined without reference to earning capacity, and earning capacity becomes relevant only if a deviation from the guidelines is sought under Section 46b-21-5a-3 (b)(1)(B). A. Rutkin, K. Hogan S. Oldham, Family Law and Practice (2nd Ed. 2000) Section 38.19, citingUnkelbach v. McNary, 244 Conn. 350 (1998). Applying this principle to the facts at hand, the first step in setting child support is to calculate support using a weekly gross for the plaintiff of $136 and a weekly gross for the defendant of $1,734.50. This produces presumptive weekly child support of $331.00 from the defendant to the plaintiff.
The second step in setting child support is to determine whether to deviate from the presumptive support based upon Child Support and Arrearage Guidelines Section 46b-215a-3 (b)(1)(B) which permits the court to deviate from presumptive support if it would be inequitable or inappropriate based upon the parent's earning capacity. In this case, CT Page 3458 both parties seek a deviation based upon the alleged earning capacity of the other.
Both parties have submitted worksheets which begin with different assumptions. The plaintiff uses her actual current gross income of $136 per week but uses an estimated earning capacity figure for the defendant of $3,077. This is based upon a claim that the defendant has a demonstrated ability to have adjusted gross earnings of $160,000 per year. The defendant's worksheet uses his actual current weekly adjusted gross of $1,734.50 per week but uses an estimated earnings figure for the plaintiff of $400 per week. This is based upon the claim that anyone of the plaintiff's intelligence and education could earn this amount in the economy of the Danbury area. But this claim is speculative at the moment. The plaintiff will eventually earn more than $136 per week. But it would be reasonable for her to decide that she needs a period of training before she is ready to work full time. During this training she may not be able to earn even $136 per week. It is too speculative to calculate child support on anything other than her present earnings.
The plaintiff's argument concerning the defendant's earning capacity is based upon a review of his income tax returns for 1996-1999. Between 1996 and 1999 the defendant's gross earnings were $187,369, $209,724, $231,228, and $211,560. This is an average of $209,970. This is higher than the defendant's current annualized gross earnings of $163,800. After deducting his business expenses, his adjusted gross income for 1996-1999 was $90,701, $97,933, $98,552 and $99,268. This is an average of $96,613.50 per year. This is higher than the defendant's current annualized adjusted gross earnings of $90,194. His yearly net after — tax income, as reflected on the tax returns for these years, was $76,063, $100,799, $64,082 and $61,375. This an average of $73,659 per year. This is higher than the defendant's current annualized net after-tax income of $66,980. To further buttress her argument, the plaintiff convincingly demonstrated that the defendant took business deductions from his income in 1996-1999 which were, in some cases, of questionable validity. He took a deduction for "rent" in the amount of $24,000 in 1996, 1997 and 1998 when there was, in fact, no rent paid. He has taken substantial deductions for business expenses which were, in fact, personal expenses. Based upon these questionable deductions, the plaintiff urged the court to find that the defendant's earning capacity after deduction of reasonable business expenses is $160,000. This is, of course, far higher than the defendant's present earnings after deduction for reasonable business expenses but before taxes of $1,734.50 per week or $90,194 per year.
The plaintiff's explanation for the defendant's reduced earnings is that 1) the defendant has filed a false financial affidavit or, 2) the CT Page 3459 defendant is "slacking" and is not working as hard as in the past. There is no credible evidence that the defendant's financial affidavit is inaccurate. The defendant had good reasons for taking the job in Houston. His earnings are easily verified and his expenses seem reasonable at the moment. He may earn more money in the future, and his history indicates that he will. Nor is there any credible evidence that the defendant has deliberately reduced his earnings. He is working hard. But, his history indicates that he will be earning more money soon. This will occur by working his present job from his home or by taking a new job which is closer to home and does not have the huge travel expenses associated with his present job. Therefore, the court will deviate from the guidelines by increasing the presumptive support to $400 per week.
The plaintiff seeks periodic alimony in the amount of $385 per week. The defendant asks that he not be ordered to pay alimony. This is a 17 year marriage involving a homemaker who is now 46 years old. She had limited work experience before the marriage and almost none during the marriage. She had her first child soon after the marriage and stayed home to care for the children while the defendant developed his career. The defendant traveled extensively in his work and the plaintiff was home alone with the children for much of the time. She has sacrificed her career goals while the defendant has become a skilled computer consultant with the prospect of continued employment in this field. The parties have led a comfortable upper middle-class life. The plaintiff will need time to develop her skills so that she can support herself in something approaching this standard. Even after a period of training, the plaintiff will never be able to earn at a level equal to the defendant's. It is appropriate that she receive some help from the defendant while she develops vocational skills and to continue to receive help for a longer period at a reduced level to offset some of the discrepancy in earning power. Having considered the criteria set forth in Section 46b-82, the court finds that alimony in the amount of $150 per week for a period of 3 years and then $100 per week for 7 additional years is appropriate. Rehabilitative alimony, or time limited alimony, is alimony that is awarded primarily for the purpose of allowing the spouse who receives it to obtain further education, training, or other skills necessary to attain self-sufficiency. Bornemann v. Bornemann, 245 Conn. 508, 539
(1998).
The plaintiff claimed that from the proceeds of the sale of the marital home the defendant should be forced to pay the plaintiff the sum of $61,000 representing one-half of the amount which he allegedly dissipated "through financial mismanagement, irresponsibility and economic waste." It is true that the parties had some unusual spending habits. But, the evidence leads to the conclusion that the plaintiff was an active participant in much of that spending. For example, the parties spent huge CT Page 3460 sums to prepare for problems which might result from Y2K on January 1, 2000. Both parties agree that the desire to make this expenditure was fueled by emotional discussions which they both had with the pastor and members of the church where they both worshiped. Also, the defendant spent about two years working as a computer consultant for major companies which were spending huge sums to prepare for Y2K. This helped convince him that their family needed to protect itself in the event that there were major disruptions in electric power and other utilities and services. Therefore, the parties spent approximately $72,000 for various preparations including a huge generator and special power supply, a basement full of long-lasting military rations, solar panels, an underground propane tank, a night scope, and a special radio and radio tower. Although the plaintiff was not always aware of the extent of the expenditures, and knew nothing about the solar panels, there is no authority for her to seek reimbursement for money spent for the benefit of the entire family, even if ill-advised in hindsight.
The plaintiff also makes an issue about large charitable contributions made by the defendant during the marriage and about the defendant's liquidation of his IRA in the amount of $24,000 on December 1, 1998. It is unavailing for the plaintiff to complain about the charitable gifts. Most were made with her consent and were made to support churches where they both worshiped. The IRA was liquidated because the defendant had been unemployed for about three months and the family needed the money to live on.
Another example of financial waste cited by the plaintiff was the expenditure of more than $12,000 for a children's playground in the yard of the marital residence. The playground constructed by the defendant is quite elaborate, more in keeping with what one might expect in a school yard or public park. Although the plaintiff knew about the plans for the playground, she had no idea that it would cost so much. But, as with the Y2K spending, the funds were spent for the benefit of the family, especially the children.
There are, however, expenditures which were made by the defendant after the date of the dissolution and while the automatic orders were in effect. The plaintiff spent $7,805.74 in June and July of 2000 on landscaping which was not necessary and had not been consented to by the plaintiff. This expenditure was unreasonable. The plaintiff was also unaware of the expenditure of a total of $4,125 in November 1999 and May 2000 for the defendant's hair implants. This money was spent while the automatic orders were in place. The defendant did not have consent from the plaintiff This expenditure was unreasonable. Beginning in the spring of 2000 the defendant spent $4,000 for a detective to spy on the plaintiff This expenditure was made without the consent of the plaintiff CT Page 3461 while the automatic orders were in effect. It was unreasonable. Automatic order number one prohibits the disposal of any property individually or jointly held by the parties without consent, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees. The detective, the landscaping, and hair implants (none of which were made in the usual course of business or for customary and usual household expenses), the total amount of which is $15,930.74, were all made in violation of the automatic orders.
The parties purchased the marital home on Great Plains Road in Danbury in 1994. The purchase price was $191,500. The down payment was made with joint funds and the payments for mortgage, taxes, insurance and maintenance have all been made with joint funds. The parties disagree as to the present value of the property although in 1998 they valued it at $250,000 in an application for refinancing. Both parties offered the testimony of a real estate appraiser. Having considered their opinions, the fair market value of the property is found to be $250,000. There is a present mortgage balance of $171,000. The parties are both living in the house, but the plaintiff would like to leave. The defendant wants to keep the house. The plaintiff will need to pay approximately $1,300 per month to rent a two bedroom apartment or condominium in the Danbury area.
The two younger children of the parties, Gregory and Andrew, both attend a private religious school. The parties would like the children to continue in this school through the 12th grade. The tuition is $386 per month. There are miscellaneous school expenses of approximately $40 per month.
The parties have accumulated a prodigious quantity of personal property which they have been unable to divide. With the exception of certain items to be discussed below, the court was not provided any evidence of the value of this property.
The parties own two paintings by S. David Anderson, both purchased with marital funds. The one titled "Big Medicine"has a value of $1,500 and the second, titled "Bears Paw" has a value of $1,000. The plaintiff has a basket collection with a value in excess of $1,000. The plaintiff has artwork of her own which may have monetary value.
The parties have three life insurance policies. The defendant owns a whole-life policy on his life with Prudential in the face amount of $150,000. It is paid up and has a cash value of $12,146.12. The plaintiff owns a policy with Provident in an unknown amount and with an unknown premium. The plaintiff owns a whole-life policy with Prudential in the face amount of $60,000. The premium amount and status of the payments are unknown as is the cash value, if any. Only the defendant's Prudential CT Page 3462 policy can be found to be reasonably affordable.
The parties have three cars. The defendant drives a 1999 Ford truck valued at $26,150. It has a loan balance of $30,000. The plaintiff drives a 1999 Windstar minivan valued at $26,600. It has a loan balance of $22,000. There are repairs which must be made and which the plaintiff has been unable to afford. But, there is an extended service agreement which should cover the cost of some or all of these repairs. The parties also own a 1990 Plymouth, valued at $1,300, which sits in the driveway. Their son Jason may be able to use the car at some point.
The defendant and his mother, Jane Bonadio, are listed as joint owners, with rights of survivorship, on a mutual fund account with The Managers Fund. As of December 31, 1999 there was a balance of $99,531.82 in this account. This money belongs to Jane Bonadio. She made all of the deposits and pays taxes on all of the earnings. The defendant's name is on the account as an accommodation to his mother and as a crude form of estate planning.
The court issues the following orders:
1. The marriage of the parties, having broken down irretrievably, is hereby dissolved.
2. The Stipulation As To Custody And Visitation dated December 6, 2000 is incorporated by reference into this decree.
3. The defendant shall pay to the plaintiff child support in the amount of $400 per week. Child support shall be payable until each child attains the age of 18 years, but if still in high school, support shall continue through high school graduation but not beyond the age of 19 years. Payment shall be by immediate wage withholding. The parties are ordered to give notice to each other of any changes of their employment in regard to hours worked, rate of pay, and place of employment. This notice shall be provided within ten days of the change.
4. The defendant shall maintain medical insurance coverage for the minor children. The defendant shall pay 93% and the plaintiff shall pay 7% of the cost of unreimbursed medical and dental expenses of the children in accordance with the Guidelines.
5. The defendant shall be responsible for the tuition and miscellaneous school expenses through the 12th grade for the two minor children at New Hope Christian Academy, or other comparable school agreeable to both parties. CT Page 3463
6. The defendant shall pay to the plaintiff periodic alimony of $150 per week for 3 years and $100 per week for an additional 7 years. This alimony shall terminate upon the death of either party, the plaintiff's remarriage, or the plaintiff's cohabitation with another person.
7. The defendant shall be entitled to take the two youngest minor children as dependency exemptions as long as he is entitled to do so under federal law and as long as he is current in his child support on December 31.
8. The defendant shall purchase the plaintiff's interest in the family home located at 218 Great Plain Road, Danbury, Connecticut at a price of $47,465.37. This reflects one-half of the equity based upon a value of $250,000 less a mortgage balance of $171,000 plus one-half of the amounts spent by the defendant in violation of the automatic orders. The defendant shall pay the sum of $47,465.37 to the plaintiff within 60 days from the date of this decision. Upon receipt of the full $47,465.37, the plaintiff shall vacate the property within 30 days. The defendant shall be responsible for the mortgage, taxes, and encumbrances on the property, and shall indemnify and save the plaintiff harmless from payment of these obligations.
9. The defendant shall retain title to the 60 acres of vacant land in Broome County, New York, free and clear of any claim of the plaintiff.
10. The plaintiff shall retain the 1999 Windstar free and clear of all claims of the defendant, and shall indemnify and hold the defendant harmless on the payment of the loan on that vehicle. The defendant shall provide the plaintiff with any material in his possession regarding the extended service agreement on that vehicle. The defendant shall retain the 1999 Ford truck free and clear of all claims of the plaintiff, and shall indemnify and hold the plaintiff harmless on the payment of the loan on that vehicle. The defendant shall retain the 1990 Plymouth free and clear of all claims of the plaintiff.
11. The defendant shall retain all of the furniture and personal possessions in his office. The plaintiff shall retain her basket collection and her own artwork. The plaintiff shall retain the painting by Anderson titled "Big Medicine" and the defendant shall retain the one titled "Bear Paw". The parties shall retain joint ownership of the military rations. The defendant shall make arrangements for charitable donation of the military rations and shall supply the plaintiff with proper documentation of this donation so that each party will be able to take a charitable deduction of one-half of the value of the food on their 2001 income tax returns. Each party is assigned one-half of any payments made from the Harold Gifford Restitution account. Each party is assigned CT Page 3464 one-half of any payments received on the refund due for return of the solar energy panels. The parties shall retain joint ownership of the generator and radio tower. The defendant shall immediately make diligent efforts to sell the generator and the radio tower. Each party is assigned one-half of the proceeds from the sale of these items. With respect to all other items of personal property, the parties are ordered to attempt to reach agreement on an equal distribution based upon fair market value. If the parties are unable to reach agreement, the parties are referred to Family Relations for binding arbitration without recourse to the court.
12. The defendant shall pay the unpaid fees and costs of Attorney Sharon Dornfeld, attorney for the minor children. The total unpaid balance is $2,947.27 which he is ordered to pay within 60 days.
13. The parties shall each be responsible for the payment of their own counsel fees.
14. The defendant shall maintain the existing life insurance policy on his life in the face amount of $150,000 for the benefit of the minor children so long as they are minors and not emancipated.
15. The plaintiff shall transfer to the defendant her 1% membership interest in Spur Software, L.L.C., free and clear of all claims of the plaintiff.
16. Within 30 days from the date of this decision, the defendant shall pay the judgment to Danbury Hospital in the amount of $1,149, and the plaintiff's unpaid dental bill in the amount of approximately $1,500 not shown on the plaintiff's financial affidavit. In all other respects, the parties shall be responsible for their individual debts and liabilities as set forth on their respective financial affidavits.
17. The plaintiff shall relinquish all claims to the mutual fund account with the Manager Fund in the names of the defendant and his mother, Jane Bonadio.
JOHN W. PICKARD, JUDGE OF THE SUPERIOR COURT