[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties were married on July 19, 1987. They have two children, Evan, born October 10, 1988, and Gillian, born May 9, 1992. Both children live primarily with the plaintiff wife ("wife"). The parties have been CT Page 12969 essentially living separate and apart since late 1996 or early 1997, when the defendant husband ("husband") permanently moved out of the family home, first to live with friends and then to his own apartment. The court heard testimony over the course of five days from January to March when the case was closed. The matter was reopened by agreement on May 15, 2001, and further evidence was received, in particular regarding the husband's April bonus.
The wife is 41 years old. At the time of their marriage, the wife had both a Bachelor's and a Master's Degree. During the marriage she obtained her Ph.D. from Adelphi University on Long Island. She is currently employed as an assistant clinical professor and researcher in the Department of Psychiatry at Yale University School of Medicine. She works approximately 2/3rds time and is principally responsible for the care of the minor children. In the past, she has earned up to $60,000 per year. In 2000, she earned $44,000 and at the rate of $47,000 per annum during the first part of 2001. She testified that the finding for her project has stopped, and that she expects to lose her job. In April of 1994 she was diagnosed with breast cancer and underwent a modified radical mastectomy followed by six months of chemotherapy and six weeks of daily radiation. She has had regular follow-ups and has taken Tamoxafin among other medications. In September of 1999 her status changed once again following a bone scan, when it was discovered that the cancer had metastasized to her head. She had an operation to remove a quarter-sized portion of her skull. This was followed by six more weeks of radiation to the front of her head. She has a scar and a permanent loss of hair. In addition to taking medication, she undergoes an all-day intravenous drip from time to time, as well as monthly examinations and blood work. Until recently, this was performed at Memorial Sloan-Kettering, however, due to her inability to pay her outstanding charges she is indicated to the court that she will be changing doctors. She emphasized that her diagnosis is considered "stage four" cancer, and based on her understanding, the average life expectancy with her condition is between one and three years.
The husband is 46 years old. He received his Bachelor's Degree from Brown University in 1983 followed by an M.A. in Public and Private Management from Yale in 1985. He works for a consulting firm in which he is a principal having an ownership interest therein. He has throughout the marriage steadily increased his income, not only his base salary, but also a bonus. His most recent income tax return indicated that he earned four hundred eighty-nine thousand dollars per annum. Recently his firm changed from corporate status to that of an LLC. He testified that all partners are required to make capital contributions on an annual basis. The last two years he was allowed to postpone this investment, however, he testified that it is expected that he make up this deficit. His job CT Page 12970 requires him to do some travel. It is clear from the testimony that the husband handled the family finances throughout the time the parties were living together.
The parties purchased their first home in June of 1988 at Clinton Avenue in Westport. The purchase price was $325,000. In May 1988, they received what was described as a "loan" of $105,000 in the form of a check from her parents. The wife testified that while her parents have never asked for repayment, that amount is still outstanding. No note or deed was signed, however, the check had a notation on it referencing a loan. That home was later sold and the parties purchased a house at Cross Highway in Westport where the wife currently resides with the two minor children. The wife testified that the current house at 51 Cross Highway is deteriorating. She indicated it needs a lot of work. For instance, the deck needs to be sanded and treated. There are cracks in the ceilings. In addition, there are septic problems (she indicates that it backs up once every two months) and she says there are insects and termites. There is a broken Jacuzzi, the kitchen floors need sanding, and there are problems with the heating system. In addition to their real estate, the husband has some deferred income accounts through his present employer.
The husband purchased a $26,000 2000 Honda Odyssey in September of that year. He paid $5,000 down and financed the rest. He never got his wife's consent as is required by the automatic orders. The husband testified that he simply is anticipating his family needs when the new baby is born and he has visitation with his two children.
The wife testified at some length that she has had to borrow from time to time from her sister and from her parents, and that she still owes them money. In fact, she indicated that from time to time her mother would lend her a credit card to use for specific purchases. She said that her parents are not wealthy, but that they feel badly for her. She also testified that on occasion her mother has refused to let her use the credit card. Along the same lines, the husband testified at some length that he felt that his wife's spending was out of control and that he had tried on more than one occasion to bring his concerns to her attention. He indicated that she repeatedly ignored him. The wife testified that the husband threatened to cut off more than one credit card. He testified that he sent a letter of explanation, although there is some disputed testimony with regard to the delivery of that letter. The wife denies any reckless spending on her part. In fact, she testified that she buys "virtually all" of her clothes at the resale shop.
The husband indicated that he would like to receive some personal items from the Westport home but has been denied access by the wife. These include his mechanic's tools, a baseball card collection and a CT Page 12971 four-drawer antique wooden chest of drawers. This would appear to be a serious bone of contention since its provenance is in dispute, the wife indicating that the chest was inherited by her from a deceased uncle. In fact, there is conflicting testimony received by the court as to the description and source of this particular item.
The parties testified as to a controversy over the purchase of a 1999 Volvo. The wife I indicated that she wanted a new car for the nanny. The husband indicated that she could have that but only if she used the $3000 insurance proceeds that were received subsequent to the nanny's accident with the prior car.
Both parties testified that they historically lived beyond their means for most of the year and relied on the husband's bonus at the end of the year to even things out. Since the separation and the issuance of the pendente lite orders, for instance, the husband has spent most of last year's bonus meeting those obligations including his current one to pay $6,800 a month unallocated alimony and child support. In fact, it is his testimony that of the $133,000 he received for his 1999 bonus all he had left was $16,000, in part due to repayment of loans and investment in his capital account at Robert H. Schaffer. The husband indicated that his new corporate entity has shifted fiscal years, but that it will be unlikely effect his normal bonus. He did say that his numbers were approximately 25% below the previous year but that he did anticipate that the bonus would be more than $135,000. This next bonus was likely to be paid during the second half of April but that another one was probably not going to be received in the calendar year. The bonus would cover the period for the year ending December 31, 2000. He indicated that his company will tell him by the end of the month of March what the bonus is likely to be. He testified that his bonus is geared to the overall success of the firm and his own personal performance. At the later hearing, the husband filed a financial affidavit which disclosed that on April 15, 2001, he in fact, received a gross bonus of almost $162,000.
The court heard from Sarah Forbes who is the Comptroller of the husband's employer Robert Schaefer. She testified that the cost to Ms. Miller for continuation coverage would be $279.18 a month. The dental coverage is separate and costs an additional $38.80 per month. She had testified that these numbers do change from time to time, and that there probably would be some premium increase in the near future. She also testified regarding the borrowing that the husband made from the company totaling $75,000 during April 1999 through and including August 2000. In addition, she testified while under the prior agreement there was no contractual duty for employees to make capital contributions for the firm, the new LLC has a capital contribution requirement for persons in Mr. Michaelson's position. CT Page 12972
The husband testified that his relationship with his children is "close." According to him, it is a continually developing relationship. He feels that he has a warm family life. He has dinner together with the children and he reads to them in front of the fire. He says that each competes with the other to tell him things, and that he helps them with their homework. He indicated that he has been involved with his son's sports including the management of his baseball and basketball teams. The latter has been problematic for the wife since she indicates that the son has developed some elbow problems due to his pitching, and she blames the husband. He also indicated that they go on family ski weekends. He describes his daughter as talking a lot and "very serious." According to him he has fully complied with Judge Kavanewsky's previous orders, and that he and his wife try to accommodate each other when there are changes. The wife testified that the husband has not fully complied with prior orders. The husband's testimony is that he has in "total" not missed the time allotted to him.
The court heard testimony from Ms. Bjornsen, a former au pair who was brought from Norway at the husband's expense to testify on his behalf She testified at some length with regard to her stay with the family during the year commencing September 9, 1996. She recounted some instances of family arguments, however, the court does not accord much weight or significance to her testimony.
Much was made by both sides of the manner in which the wife found out about her initial cancer diagnosis. The wife insists that the husband called her in Long Island where she was attending school and simply blurted out the diagnosis. She indicated that she was devastated by the news and had to have friends drive her back to Connecticut. The husband's recollection differs, and he insists that he merely responded to her inquiry. He also indicated that he had picked up the slack with the children and with her in the initial stages of her treatment. The court does not accord substantial significance to this particular incident, since it is merely one element in a troubled marriage that, the unconverted testimony of both parties reveals, was breaking down shortly after it was initiated. In fact, one of the parties testified that they were attending marriage counseling three months after the honeymoon. What this court sees are the reactions of each of the parties to a marriage, shaky at best, when confronted with a situation of such tragic proportions. What is particularly apparent to the court, and which bears repeating, is the fact that the diagnosis itself created multiple victims that included not only the wife herself, but the husband and the two children as well — all have suffered to varying degrees, and it is the children for which this court has some long-term concerns. It is also apparent to this court that both parents reacted somewhat solipsistically CT Page 12973 to the diagnosis. While it is true that there was a limited "time out" from their marital problems in the initial stages of the wife's treatment, the fact remains that instead of coming together as a family unit, each tackled the problem from their own standpoint, essentially with blinders on. The wife understandably marshaled all of her resources in her attempt to fight this dread disease. She was apparently successful only to get the doubly devastating news of its recurrence. Throughout the course of the trial, however, this court has gotten the clear impression that she failed to fully appreciate the devastating psychological impactthe news had upon the husband not the least of which was the very real possibility that he might have to raise two small children all alone. In addition, she failed to take into account the husband's overridingemphasis on financial security and wealth building, and that her spending during this period simply played to his worst concerns and fears. On the other hand, the husband, who the court has noted places great emphasis on the family's fiscal stability, has demonstrated a singular insensitivity
toward his wife's plight and was unable to give her the emotional support which she desperately needed. Instead of being supportive, his pleas to her to curb spending became increasingly strident and threatening, and eventually culminated in his termination of her credit and the closure of family bank accounts while she was out of state on a trip. A perfect example of the aberrant behavior of both parties under the circumstances was the wife's purchase of an expensive swing set for the children. The husband indicated that it was basically the proverbial "straw that broke the camel's back." According to him, the children really did not need it, and that it was a large and inappropriate purchase at a time when he had indicated clearly to her that there were problems with the family finances. She testified that the swing set was a basic swing set and was replacing an old one that was rusted and out of date. The husband's offer of testimony regarding this purchase clearly demonstrated his misplaced priorities — he just couldn't let it go.
Both parties have since found solace with other persons. The husband testified that his current significant other (a co-worker) is pregnant with their child.
 FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, as well as the factors enumerated in Sections 46b-56, 46b-81, 46b-82, 46b-84, and 46b-215a of the Connecticut General Statutes, including the Child Support and Arrearage Guidelines Regulations, hereby makes the following findings:
 1. That it has jurisdiction. CT Page 12974
2. That the allegations of the complaint are proven and true.
 3. That the marriage of the parties has broken down irretrievably, and that ample evidence exists that both parties have contributed to said breakdown.
 4. That it is equitable and appropriate that the wife be awarded permanent periodic alimony; and that while the court has considered all of the statutory factors, it has given significant weight to the length of the marriage as well as the fact that the wife's present earning capacity is between $45,000 and $60,000 per annum, but is limited by virtue of her child rearing responsibilities and her health.
 5. That the husband has a substantial, demonstrated earning capacity; that his base earnings amount to in excess of $100,000 per annum; that he has received regular and substantial bonuses from his employment and is, in the future, likely to continue to receive significant payments in excess of $150,000 per annum over and above his annual base earnings; and that it is equitable and appropriate to base the financial orders of the court on his total earned income from employment, including the bonus.
 6. That the wife has had use of her mother's credit card from time to time since the separation of the parties; and that the use of the card did not constitute a regularly recurring source of income. Unkelbach v. McNary, 244 Conn. 350 (1998).
 7. That the husband has a proprietary interest in the business called Robert H. Schaffer Associates, LLC (formerly Robert H. Schaffer Associates, Inc.); that this has I been achieved largely through the efforts of the husband but that substantial marital I assets have been invested therein; that it is equitable and appropriate that the husband keep his interest in that asset free and clear of any claims by the wife; but that during the marriage up to and including the date of separation, in addition to the contribution of marital funds as noted above, the wife made significant contributions to the marriage both CT Page 12975 financially and as a homemaker; and that it is equitable and appropriate for the court to consider her contributions in the overall division of marital assets, in particular with regard to the marital home.
 8. That the husband is vested in certain deferred compensation plans at Robert H. Schaffer 
Associates, LLC (formerly Robert H. Schaffer 
Associates, Inc.) entitled Money Purchase Plan and a Profit Sharing Plan; that the husband has the greater opportunity to acquire capital assets and income in the future; that, in addition, the court has taken into consideration the earning capacity, needs, and health of the wife; and that it is equitable and appropriate that the wife share in any contributions and appreciation thereto for the period starting with the date of the marriage to and including September 1, 2001.
 9. That during the pendency of the action, the husband expended the sum of $5,000 toward the purchase of a new car; that said expenditure was without the agreement or order of court; that such expenditure was not for a customary and usual household expense and was therefore in violation of P.B. Section 25-5
(automatic orders); and that it does not make a finding of contempt, but that it is equitable and appropriate to make an adjustment in favor of the wife with regard to the division of the marital estate.
 10. That the court appointed Elaine S. Amendola, Esq. as attorney for the minor children; that each of the parties agreed to share the legal fees and costs incurred by said attorney; that to date, said attorney has incurred the sum of $21,705; that the husband has paid the sum of $5,000 to date and that the wife has paid nothing, leaving an outstanding balance in the amount of $16,705; and that it is equitable and appropriate that each party contributes to the payment of this balance.
 11. That the parties are the joint owners of the real estate known as 51 Cross Highway, Westport, Connecticut; that said property was purchased in CT Page 12976 part with the proceeds from their prior joint real estate on Clinton Avenue, Westport; that the Clinton Avenue property was purchased in part with monies advanced by the wife's parents in the amount of $105,000; that it is equitable and appropriate for the court to take into consideration the source of said funds; that the fair market value of the Cross Highway property is $700,000; that it has outstanding loans against it in the amount of between $403,000 and $450,000; and that the equity in said property is approximately $297,000 to $350,000.
 12. That the presumptive basic child support is $566.00 per week; that the combined net family income of the parties is in excess of the Child Support Guidelines; and that it is equitable and appropriate to deviate from the Child Support Guidelines on the basis of the coordination of total family support [46b-215a-3(b)(5)] and the best interest of the minor children [46b-215a-3(b)(6)(B)].
 ORDER
IT IS HEREBY ORDERED THAT:
 1. The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried.
 2. The parties shall have joint legal custody of the minor children, Evan, born October 10, 1988, and Gillian, born, May 9, 1992. The parties shall share physical custody of the minor children in accordance with the existing Parenting Schedule Order entered by this court on January 29, 1999 (Kavanewsky, J.). The court believes that this is in the best interest of the minor children inter alia to maintain a familiar routime. The parties shall consult with one another concerning all major issues involving the minor children, including but not limited to, health, education, and religious affiliation and training. In the event that parties are unable to agree upon any issue regarding custody and/or appropriate visitation, they shall first bring the matter to the Family Relations Office prior to a determination by the Court.
 3. Commencing October 1, 2001, and monthly thereafter, the husband shall pay to the wife the sum of $2,000 as and for periodic CT Page 12977 alimony, until the death of either party, or the remarriage of the wife, or January 1, 2011, whichever shall sooner occur. Thereafter, the husband shall pay to the wife the sum of $3,000 as and for periodic alimony, until the death of either party, or the remarriage of the wife, whichever shall sooner occur
 In addition, commencing January 1, 2002 (or at such later time as the husband is in receipt of the cash component of his annual bonus ("cash bonus") for the previous calendar year) and annually thereafter, the husband shall pay to the wife 30% of his gross cash bonus, up to and including a cash bonus in the amount of $300,000, as and for periodic unallocated alimony and support, until the death of either party, the remarriage of the wife, or December 31, 2011, whichever shall sooner occur. If alimony shall terminate prior to December 31 in any year, except for the death of either party, the payment normally due the following January (or following receipt of same whichever is later) shall be prorated based upon the number of days up to and including the day of termination of said alimony. Said additional payments shall be made within thirty (30) days after his receipt of same.
 The wife shall have the right to earn up to $75,000 per annum from employment before the husband shall have the right to seek a modification of alimony on that basis alone.
 4. Commencing October 1, 2001, and monthly thereafter, the husband shall pay to the wife the sum of $4,000 as and for child support, until such time as the oldest child shall reach the age of eighteen years, at which time child support for the remaining child shall be adjusted in accordance with the then existing Child Support Guidelines or as a Court may otherwise direct. The foregoing notwithstanding, if any child shall turn eighteen years old and is still in high school, then, in that event, the child support shall continue until the first day of next month following graduation from high school or their nineteenth birthday, whichever shall sooner occur, pursuant to Section 46b-84 (b) C.G.S.
 5. As to the jointly-owned real estate at 51 Cross Highway, Westport, Connecticut, within thirty (30) days from the date hereof, the husband shall convey his interest therein to the wife by means of a fully-executed Quit Claim Deed along with completed Conveyance Tax Forms. Thereafter, the wife shall have exclusive possession of the real estate, subject to the existing indebtedness, and she shall be responsible for the payment of all mortgages, liens, taxes, and insurance, and shall indemnify and hold the husband harmless from any further liability thereunder, including any balance outstanding to the wife's parents. The wife shall pay to the husband the sum of CT Page 12978 FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) upon the sale or other transfer of title to the property (or any portion of it), a refinance of the existing mortgage for an amount greater than 20% more than the current balance of same or the obtaining of new or additional financing for an amount greater than the current balance of the existing mortgage, or five (5) years from the date of this Memorandum of Decision, whichever shall sooner occur. The wife shall execute a simple Promissory Note to the husband containing the usual language regarding the payment of reasonable attorneys fees and costs in the event of her default, and which shall not bear interest if paid on or before the end of such five (5) year period, but which will carry simple interest at the rate of eight (8%) percent per annum thereafter until paid in full. Said Promissory Note shall be secured by a mortgage deed. Both the deed and note shall be executed simultaneously with the delivery of the Quit Claim Deed to the wife.
6. Personal property shall be divided as follows:
A. The children's furniture shall remain in the wife's residence.
 B. Except as otherwise provided herein, the home furnishings at 51 Cross Highway, Westport, Connecticut (other than the children's furniture) shall belong solely to the wife, and the husband shall have no further claim thereto. The personal property currently in the husband's residence will belong solely to him without a further claim by the wife.
 C. Each party shall be entitled to keep the automobile which they are currently driving free and clear of any claims by the other, and each party shall cooperate with the other regarding the execution of any documentation necessary to transfer and/or register same.
 D. The husband shall be entitled to keep free and clear of any claims by the wife the following:
(1) Baseball card collection;
(2) Security deposit (15 Chapel Hill Rd.)
 (3) Robert H. Schaffer Associates, Inc. stock and/or the equivalent of the husband's proprietary interest in Robert H. Schaffer 
Associates, LLC.
(4) Mechanic tools CT Page 12979
(5) Four-drawer, antique chest of drawers
 E. The wife shall be entitled to keep free and clear of any claims by the husband the following:
(1) TIAA-CREF Annuity
(2) Charles Schwab Account # FG 6326-4409
(3) Salomon Smith Barney Account # 619-12078
(4) People's Bank — checking account
 F. The balance, if any, of the "bonus escrow" funds held by Charles Schwab, after the deductions as set forth elsewhere herein, shall be divided equally by the parties.
 7. The husband shall maintain and pay for health insurance for each of the minor children so long as he shall be obligated to pay child support for that child. Un-reimbursed medical, dental, orthodontic, optical, pharmaceutical, psychiatric, and psychological expenses for the minor child, shall be divided by the parties, 65% by the husband and 35% by the wife. The provisions of Section 46b-84(e) shall apply.
 The husband shall promptly notify his employer as to the change of marital status and shall cooperate with the wife in obtaining continuation health insurance coverage as provided by state and federal law. The wife shall be responsible for the payment of any premiums due for such coverage.
 8. The husband shall maintain so much of the existing life insurance (whether whole life or term) in the amount of $750,000, and shall name the wife and minor children equal beneficiaries thereof for so long as he has an obligation to pay alimony and child support under the terms of this decree. In the event that alimony terminates for any reason, and the husband shall have a child support obligation to any child, he shall maintain a minimum of $250,000 coverage for each child for whom he has such an obligation for the duration of said obligation.
9. The Deferred Income/Retirement Accounts shall be divided as follows:
 A. As to the Charles Schwab IRA: Within fourteen (14) days from the date of this order, the husband shall transfer to the wife a sum equivalent to 50% of the balance in said account as of September 1, 2001.
CT Page 12980
 B. As to the Robert H. Schaffer Associates, LLC Profit Sharing Plan: Effective as of September 1, 2001, the then balance of the Robert H. Schafer Associates, LLC Profit Sharing Plan ("Plan")of the husband through his employer, together with any interest and/or additions accrued thereon as of the actual date of distribution, shall be divided by means of a Qualified Domestic Relations Order ("QDRO") which shall be prepared by the attorney for the wife, 50% to the husband and 50% to the wife. The wife and her attorney shall be entitled to any and all information regarding the Plan necessary to the preparation and filing of the QDRO, including, but not limited to prior and current balances and prior account activity. No withdrawals, distributions, or transfers shall be made regarding the Plan except as consistent with this order. The Court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the QDRO and the division of the Plan. The reasonable legal fees and cost incurred in the preparation and filing of the QDRO shall be born equally by the parties.
C. As to the Robert H. Schaffer Associates. LLC Money Purchase Plan:
 Effective as of September 1, 2001, the then balance of the Robert H. Schaffer Associates, LLC Money Purchase Plan ("Plan")of the husband through his employer, together with any interest and/or additions accrued thereon as of the actual date of distribution, shall be divided by means of a Qualified Domestic Relations Order ("QDRO") which shall be prepared by the attorney for the wife, 50% to the husband and 50% to the wife. The wife and her attorney shall be entitled to any and all information regarding the Plan necessary to the preparation and filing of the QDRO, including, but not limited to prior and current balances and prior account activity. No withdrawals, distributions, or transfers shall be made regarding the Plan except as consistent with this order. The Court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the QDRO and the division of the Plan. The reasonable legal fees and cost incurred in the preparation and filing of the QDRO shall be born equally by the parties.
 D. The court shall retain jurisdiction with regard to any issues which may arise regarding the division of the retirement accounts and the preparation and filing of any qualified domestic relations orders.
 10. Except as otherwise set forth herein, the parties shall each be responsible for the debts as shown on their respective financial CT Page 12981 affidavits, and they shall indemnify and hold each other harmless from any further liability thereon. The foregoing notwithstanding, the outstanding balance due to Memorial Sloan-Kettering, including any interest or other costs, as of the date of this order, shall be paid within fourteen (14) days from the date hereof, from the "bonus escrow" held at Charles Schwab, prior to any division by the parties and after the payment of attorney Amendola's fees as set forth in paragraph 12 hereof In the event that this fund is insufficient to pay the outstanding balance, the husband shall be responsible for payment in full within fourteen (14) days hereof, and he shall indemnify and hold the wife harmless from any further liability thereon.
 11. The wife shall be entitled to claim the personal exemptions for the minor children commencing with the tax year 2001 and thereafter.
 12. The husband shall within fourteen (14) days of this order pay to the attorney for the wife, the sum of $15,000 toward the outstanding balance of fees incurred in this action. Otherwise, each party shall be responsible for their respective attorney's fees and costs incurred in connection with this action. The foregoing notwithstanding, the parties are jointly responsible for the payment of the outstanding fees of the attorney for the minor children having a balance as of December 1, 2000 in the amount of $16,705, and same shall be paid in full within fourteen (14) days of this order by deducting that sum from the "bonus escrow" held at Charles Schwab, prior to any division by the parties. If this sum is insufficient to pay the balance in whole or in part, each party shall pay as follows: 2/3rds by the husband and 1/3rd by the wife.
 13. The Court hereby orders a Contingent Wage Withholding Order pursuant to Section 52-362 C.G.S. in order to secure the payment of the alimony, child support, and other financial orders.
THE COURT
SHAY, Judge.